In re Jeanette KARELIN, a/k/a
Jeanette Smith, Debtor.

Jeanette KARELIN, a/k/a Jeanette
Smith, Appellant,

v.

BANK OF AMERICA NATIONAL
TRUST AND SAVINGS
ASSOCIATION, Appellee.

BAP No. NC–89–1467 VMeJ.

Bankruptcy No. 587–05576–JRG.

Adv. No. 880040.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Nov. 15, 1989.

Decided Feb. 1, 1990.

Nicolas De Lancie, Office of General Counsel, Bank of America, San Francisco, for appellee.

Thomas A. Casazza, Palo Alto, Cal., Keith A. Ducote, San Jose, Cal. for appellant.

Before VOLINN, MEYERS and JONES, Bankruptcy Judges.

VOLINN, Bankruptcy Judge:

## OVERVIEW

The debtor and appellant, Ms. Karelin,[1] obtained cash advances on her credit card accounts with the appellee Bank of America National Trust and Savings Association ("the Bank"). Ms. Karelin obtained the cash advances for the purpose of gambling in Nevada. Several months later Ms. Karelin filed a voluntary bankruptcy petition under Chapter 7, and the Bank filed an adversary proceeding seeking to have its claim based on Ms. Karelin's credit cards excepted from discharge under 11 U.S.C. § 523(a)(2)(A).[2] After a bench trial, the

---

1. The caption on this case lists the debtor's name as "Jeanette Karelin, aka Jeanette Smith." For some reason the debtor and her counsel persist in referring to the debtor by the name "Smith," while the appellee persists in referring to her by the name "Karelin." The bankruptcy court used the name "Karelin" and for the sake of consistency we follow suit.

2. Unless otherwise specified, all references to sections or chapters shall refer to the Bankruptcy Code, 11 U.S.C. §§ 101–1330.

court rendered a judgment in favor of the Bank, and Ms. Karelin appealed. We affirm.

## FACTS

### A. Background

Ms. Karelin had an established career in the employment and recruitment field dating back to 1969. For the ten years from 1977 through 1986, her average annual income exceeded $100,000, except for 1985 when she earned only $27,000 due to illness. Ms. Karelin lost her job in December of 1986, and started her own recruitment company in February 1987. Her new company generated less than $10,000 in income during 1987. According to her bankruptcy schedules she terminated the business in September of that year, although she contradicted that statement in her testimony at trial, explaining the contradiction as "a misunderstanding or a typographical error." Her total income during 1987 was approximately $20,000, including less than $10,000 from her business, $8,370 in commissions from her previous job, and less than $5,000 from her husband's military pension.

Ms. Karelin had been a heavy casino gambler for the previous fifteen or twenty years, making between one and three gambling trips to the Reno/Lake Tahoe area each month. Fifteen or twenty times each year one of the casinos would send a private jet to San Jose to bring Ms. Karelin and her guests to Nevada to gamble. It was not unusual for Ms. Karelin to gamble between $25,000 and $50,000 on a given gambling trip.

Ms. Karelin financed her gambling through credit extended by various casinos in the form of "markers,"[3] and cash advances on several credit cards. At the time she incurred the debts at issue here, Ms. Karelin's credit limit on her primary credit card was $55,000.[4] Ms. Karelin's practice was to obtain a cash advance up to her credit limit on her credit card account in the form of a cashier's check payable to a casino before each trip, use the check to pay on the amount owing to one or more casinos, and then gamble on credit extended by the casinos. Upon her return she would make a payment on her credit card account out of any remaining funds. She also made payments on her credit card account out of her salary.

In her testimony Ms. Karelin conceded that she gambled heavily during the past fifteen or twenty years without having made a net gain in any calendar year, that she did not look to gambling as a source of income, and that in the 18 months preceding her bankruptcy she suffered gambling losses of approximately $400,000, incurring approximately $260,000 in debts to casinos.

In order to satisfy her expenses during 1987, Ms. Karelin twice refinanced her personal residence, which was her primary asset, on March 30 receiving approximately $70,000 and on June 25 receiving approximately $93,000. In each instance the proceeds were used to make significant payments on her credit card accounts, but each time, within several weeks she took large additional cash advances. After the second refinancing, Ms. Karelin's residence, which was worth approximately $215,000, was encumbered by a lien in the amount of $196,000.

### B. The Debts in Question

On Thursday, July 16, 1987, having recently reduced the balance on her credit card account to zero, Ms. Karelin obtained from the Bank a cashier's check, payable to a casino known as "Harvey's," in the amount of $66,100, $55,000 of which represented a cash advance on her credit card account. She then paid the check to the casino, returned to the Bank the next Monday (July 20), and from her weekend gambling "winnings" made payments totalling $32,000 on her credit card accounts. Al-

**3.** Her bankruptcy schedules showed a total of $260,000 owing to various casinos.

**4.** Ms. Karelin had several credit cards issued by at least two banks. One of the Visa accounts with the Bank had a credit limit of $55,000 immediately before the bankruptcy, and it is that account that is the subject of this appeal. Unless otherwise specified, references herein to Ms. Karelin's credit card account refer to that account.

though the payments were posted promptly, through a Bank error, the $55,000 cash advance was not posted to the account until August 25.

On Wednesday, August 12, Ms. Karelin returned to the Bank for a cash advance in the full amount of her credit limit. Because of the posting error, the Bank's computer showed $87,000 in available credit on her account (the $55,000 credit limit plus the $32,000 credit balance due to the payments), and Ms. Karelin took an advance for the full amount in the form of a cashier's check, again payable to Harvey's.

On August 25 the first $55,000 advance was posted to Ms. Karelin's account, and the Bank discovered that the balance on the account was $110,000 plus finance charges, greatly exceeding her credit limit of $55,000. As a result, Ms. Karelin's required minimum payment for September under the terms of the credit card account was equal to the entire amount by which the balance exceeded the credit limit, or more than $57,000. This precipitated several desperate and embarrassing attempts by Ms. Karelin to stave off the inevitable consequences, first by asserting that the charges to her account were in error, then by asserting that a bank employee had agreed to increase her credit limit to a level sufficient to cover the outstanding balance, and finally by writing a series of letters to the Bank's president containing statements which Ms. Karelin ultimately admitted were not true. Ms. Karelin filed bankruptcy on October 15.

### C. Procedural History

The Bank filed an adversary proceeding seeking to have the entire outstanding balance of the credit card account excepted from discharge under § 523(a)(2)(A).[5] After a two-day bench trial at which Ms. Karelin and various bank employees testified, the bankruptcy court found that Ms. Karelin's testimony was not credible, and

that she was "hopelessly insolvent" when she accepted the cash advances, having a negative net worth exceeding $400,000, virtually no equity in her residence, less than $15,000 in unencumbered personal property, and less than $20,000 in annual income.

In view of these circumstances, the court found that Ms. Karelin took the cash advances without the intention of repaying the Bank, and concluded that this constituted actual fraud under *In re Dougherty*, 84 B.R. 653 (9th Cir. BAP 1988), rendering the resulting debt non-dischargeable under § 523(a)(2)(A).

### ISSUES

1. Was it proper for the bankruptcy court to decide this case using the legal standard of *In re Dougherty*, 84 B.R. 653 (9th Cir. BAP 1988), which held that credit card debts are incurred through actual fraud when the debtor makes charges with no intention of repaying them?

2. Did the bankruptcy court err in finding that Ms. Karelin incurred the debt in question with no intention of repaying it?

3. Did the bankruptcy court err in excluding evidence offered by Ms. Karelin consisting of copies of checks evidencing payments she made to the Bank prior to the time she incurred the debt in question?

4. Did the bankruptcy court err in determining the amount of the non-dischargeable debt?

### STANDARD OF REVIEW

■ Whether the bankruptcy court applied the correct legal standard is a legal issue, which we review *de novo*. *In re Contractors Equipment Supply Co.*, 861 F.2d 241, 243 (9th Cir.1988). The bankruptcy court's findings of fact are reviewed under a "clearly erroneous" standard. *In re Wolf & Vine*, 825 F.2d 197, 199 (9th

---

5. The pertinent portion of § 523 reads a follows:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

Cir.1987). The application of the *Dougherty* legal standard to the facts is a question of law which is reviewed *de novo*. *Wymer v. Wymer*, 16 B.R. 497, 503–04 (9th Cir. BAP 1980). The bankruptcy court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Lummi Indian Tribe*, 841 F.2d 317, 320–21 (9th Cir. 1988); *Jenkins v. Whittaker Corp.*, 785 F.2d 720, 725 (9th Cir.1986).

## DISCUSSION

### A. Application of the *Dougherty* Standard

■ In *Dougherty* we set forth the standard to be used in evaluating the non-dischargeability of credit card debts under § 523(a)(2)(A). 84 B.R. 653, 655–58 (9th Cir. BAP 1988). We declined to use either the "implied representation" theory, under which the cardholder is deemed to impliedly represent that he or she has the ability and the intention to repay the charges, or the "assumption of the risk" theory, under which the cardholder is deemed to make a false representation only if the cardholder uses the card after the issuer communicates to the cardholder that the card has been revoked. 84 B.R. at 655–56. We held that to except the debt from discharge under § 523(a)(2)(A), "the card issuer must prove by clear and convincing evidence that 'the debt was incurred through actual fraud, i.e., where the debtor made the charges with no intention of paying for same.'" 84 B.R. at 657 (citation omitted).

Ms. Karelin urges that the *Dougherty* test is appropriate only where third parties are involved in the credit card transactions, and not where, as in this case, the debt arises from cash advances directly from the issuer to the cardholder. Ms. Karelin urges that the appropriate test for the latter situation is the "assumption of the risk" test because the issuer is in a position to monitor and evaluate the status of the cardholder's account and make an informed decision whether to advance credit.

It is true that the relationship of the parties here is essentially that of a borrower and lender. But this relationship is not based on a discrete transaction. There is a continuing series of advances where the issuer does not truly make a new lending decision based on a review of the cardholder's financial condition at the time of each advance, much less review with each new transaction the borrower's capability or intentions with respect to repayment. It is unreasonable to expect that the Bank could have divined Ms. Karelin's financial difficulties or intentions with respect to repayment simply because she appeared at the Bank in person to make use of her line of credit, rather than using it by making a purchase from a third party. The *Dougherty* test therefore should be applied to credit card debts regardless of whether the charges involve third-party vendors or cash advances directly from the issuer to the cardholder.

### B. Intention to Repay

■ The record is replete with evidence of Ms. Karelin's hopeless financial condition at the time of the cash advances. There was ample evidence before the bankruptcy court to support its finding that Ms. Karelin must have been aware of the extent of the debt she was incurring by taking the cash advances, and that she could not possibly have failed to perceive the hopelessness of repaying the resulting obligation. Although Ms. Karelin testified to the contrary, her testimony in various details was impeached repeatedly and the record supports the court's decision to give her testimony little weight.

Under *Dougherty*, actual fraud is present when the cardholder made the charges with no intention of paying for them. 84 B.R. at 657. Ms. Karelin asserts that despite the hopelessness of her financial condition, she manifested the clear intention, or at least hope, of repaying the debt by applying her meager $32,000 of gambling "winnings" (out of the $66,100 that she took to the casinos) to her credit card account after she had drawn the first cash advance.

■ Care must be taken to stop short of a rule that would make every desperate, financially strapped debtor a guarantor of his ability to repay, on pain of nondis-

chargeability. Such a rule would unduly expand the "actual fraud" discharge exception by attenuating the intent requirement. A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting non-discharge.

But in this case, after hearing the testimony of the witnesses and considering the evidence before it, the bankruptcy court found that

> The defendant's intent to take the advances with no intention of repaying the Bank is amply demonstrated by the surrounding circumstances. Although the plaintiff has a heavy burden of proof in non-dischargeability cases, it is clear this burden has been met.

Memorandum Decision, p. 10 (filed May 4, 1989). This is a sufficient finding of an intention not to repay under the *Dougherty* analysis. The evidence considered by the court included the use to which Ms. Karelin put the borrowed funds, Ms. Karelin's knowledge of the consistently unsuccessful results of her more than fifteen years' gambling experience, the loss of her job and the failure of her new business, her large gambling losses immediately preceding the cash advances, the extent of her assets and the liens she had granted on them within several months preceding the cash advances, and Ms. Karelin's business experience and general demeanor on the witness stand. In light of the evidence in the record, the court's finding was not clearly erroneous.

■ Ms. Karelin also contends that the Bank bears some culpability for permitting her to draw twice the amount of her credit limit. While the Bank's erroneous record permitted Ms. Karelin to borrow more money than the Bank intended, this has no bearing on the presence or absence of fraud on Ms. Karelin's part when she took the cash advances. The trial court found that Ms. Karelin's draw of an amount far in excess of her credit limit was done knowingly, which is further evidence of Ms. Karelin's general lack of good faith.

## C. Exclusion of Evidence

■ The court excluded evidence consisting of copies of checks evidencing payments Ms. Karelin made to the Bank prior to and around the time she incurred the debt in question. The reason for the exclusion was that Ms. Karelin did not provide the evidence to the Bank as required by a pre-trial order issued by the court. Under those circumstances, Bankruptcy Rules 7016 and 7037 authorize the bankruptcy court to sanction Ms. Karelin by excluding the proffered evidence.

Ms. Karelin correctly points out that exclusion is not mandatory, but lies within the bankruptcy court's discretion. Ms. Karelin argues that the exclusion was an abuse of discretion because of the probative value of the excluded evidence.

Contrary to Ms. Karelin's assertion, however, the prejudice to Ms. Karelin by excluding the copies was not great. The court specifically recognized that the largest of the payments evidenced by the excluded evidence were made (the $32,000 in payments made several days after the first of the two cash advances at issue), and the court admitted other evidence of Ms. Karelin's prior payments to the Bank. The court's crucial findings would not have been affected by cumulative evidence of those payments. Thus the exclusion of the evidence was well within the court's discretion.

## D. Amount of the Judgment

■ Ms. Karelin correctly points out that the Bank stipulated on the record that a $5,000 payment that she made to the Bank was erroneously omitted from the statement from which the amount of the judgment was taken. The Bank asserts that the objection as to the judgment amount is not properly before us because Ms. Karelin did not raise this objection when the judgment was circulated prior to entry, did not seek modification of the judgment in the trial court, and included the full amount evidenced by the statement in her bankruptcy schedules.

While it is true that Ms. Karelin should not be permitted to raise on appeal issues

not raised below, she did raise this issue in the trial and the Bank stipulated to it. It would be onerous to require an appellant, who has already filed a notice of appeal prior to the entry of the written judgment, to object to the form of the judgment or bring a motion to modify the judgment before matters of this sort can be heard by the appellate court, especially where the error in the judgment pertains to an amount to which both parties stipulated. The Bank makes no substantive objection to Ms. Karelin's assertion concerning the error, and the judgment should be modified accordingly.

## CONCLUSION

In a general sense, Ms. Karelin was as much a victim as a culprit. The extent of her long-term gambling addiction was in large part a function of the credit and facilities made available to her by the casinos. The Bank's extension of an unsecured and unrestricted credit line in the amount of $55,000, which is more than half of Ms. Karelin's annual salary, made it possible for her to pursue her addiction to its inexorable conclusion.

The bankruptcy court, however, weighed the evidence presented to it and found that "The Bank was not a gambling partner of the defendant but simply a lender." The only direct evidence to the contrary was Ms. Karelin's testimony that the Bank knew that it was financing her gambling habit, and two cashier's checks payable to Harvey's, one of the casinos. As discussed above, the bankruptcy court did not commit clear error in discrediting Ms. Karelin's testimony, and the cashier's checks were of limited probative value because the payee on each was identified only as "Harveys" (sic) with no explicit reference to a casino.

The court properly considered the evidence in light of the *Dougherty* factors, and cannot be held to have erred in finding that Ms. Karelin's actions were intentional and fraudulent. Therefore the bankruptcy court's judgment is AFFIRMED, except that the judgment is MODIFIED by a $5,000 reduction in amount, in accordance with the parties' stipulation at trial.