In re Joseph L. RODGERS, aw Tools on Wheels Co., Inc.; Marian E. Rodgers, Debtors.

CORNWELL QUALITY TOOLS, a corporation, Plaintiff,

v.

Joseph L. RODGERS, Defendant.

Bankruptcy No. SA 89–02060 JR. Adv. No. SA 89–0670 JR.

United States Bankruptcy Court, C.D. California.

June 27, 1990.

Stanley Minier of Minier & Winters, Santa Ana, Cal., for defendant.

James A. Knudson, West Covina, Cal., for plaintiff.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

Plaintiff Cornwell Quality Tools ("Cornwell") filed a complaint objecting to dischargeability of debts under 11 U.S.C. § 523(a)(2)(A) and (B) (the "Complaint"). The Complaint alleges that debtor, Joseph L. Rodgers ("Rodgers" or "debtor"), used a false financial statement in order to become a dealer for Cornwell. The Complaint further alleges that Rodgers committed "actual fraud" by ordering tools within a six-week period with no intention of paying. I heard this adversary proceeding on March 27, 1990 and took the matter under submission.

## JURISDICTION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## STATEMENT OF FACTS

Cornwell is a supplier of small hand tools which it distributes through a nationwide network of dealers. Once a dealer is approved, he can purchase tools on credit.

In 1981, Rodgers, who had been operating as an independent tool dealer under the name Tools on Wheels, Inc., learned that his wife would inherit $100,000. The inheritance was received in March 1982.

On April 6, 1982, Rodgers signed and submitted to Cornwell a document entitled "Personal and Credit Information" (the "Credit Application"). Cornwell required each applicant to submit a Credit Application. In the Credit Application, Rodgers disclosed the value of his personal assets at less than $5,000 and the inheritance.

Rodgers also indicated that he had never "been through bankruptcy". This statement was not true because Rodgers had received a discharge in bankruptcy in 1969. Rodgers further disclosed that he was a renter and not a homeowner.

On April 19, 1982, Cornwell entered into a "Dealer Agreement" (the "Agreement") with Rodgers. Under the Agreement, Rodgers could order tools on credit without limit. The terms of the Agreement, however, required payment in full within 15 days of the billing. Later, in 1984, Rodgers was allowed to defer for ten weeks payment on a maximum limit of $3,000 (the "Deferred Account").

From April, 1982 to October, 1987, Cornwell and Rodgers enjoyed a mutually beneficial business relationship. During this period, Rodgers ordered and paid for tools amounting to approximately $500,000. Beginning in 1987, however, problems arose in the relationship. Rodgers, who was experiencing financial difficulties, reduced his weekly orders from approximately $1,400 to $650.

Cornwell knew Rodgers was having financial problems. According to the branch operations manager with supervisory responsibilities over the Los Angeles territory, it was necessary for a dealer to sell between $100,000 and $150,000 in order to make a "decent living". In response, Cornwell reduced the limit on the Deferred Account from $3,000 to $2,000.

Although Rodgers was not required to purchase a minimum amount of tools, Cornwell nevertheless pressed Rodgers to buy more. In fact, around August or September 1987, Rodgers was told by a Cornwell representative that he would be terminated as a dealer if he failed to increase his purchases. Up until this point, Rodgers had been current in his billings.

In response to Cornwell's threat and desiring to stockpile tools in case of termination, Rodgers increased his purchases dramatically during the ensuing six weeks. Following October 2, 1987, Rodgers purchased tools valued at $26,240.86 while making only $2,955.10 in payments.

The following accounting shows the sudden change in Rodgers' pattern of purchases during a 12–week period:

| Week Ending | Purchases | Payments | Amounts Due |
|---|---|---|---|
| 8–28–87 | – 142.11 | 547.87 | 1,669.95 |
| 9–4–87 | 136.35 | 529.96 | 1,810.87 |
| 9–11–87 | 1,809.64 | 0 | 2,638.80 |
| 9–18–87 | 163.70 | 541.73 | 2,790.73 |
| 9–25–87 | 105.32 | 1,057.34 | 2,324.31 |
| 10–2–87 | 0 | 0 | 2,856.77 |
| 10–9–87 | 3,311.08 | 823.80 | 2,351.60 |
| 10–16–87 | 3,087.92 | 690.39 | 5,438.50 |
| 10–23–87 | 3,565.94 | 589.82 | 9,024.27 |
| 10–30–87 | 4,336.52 | 532.46 | 13,353.69 |
| 11–6–87 | 8,128.02 | 318.63 | 20,434.68 |
| 11–13–87 | 3,811.38 | 0 | 24,744.16 |

Rodgers admits that he knew he could not pay according to the terms of the Agreement when he increased his orders. For 1987, Rodgers had a net income of $1,893. Moreover, for the same period, Rodgers had no alternate source of income.

When Rodgers was confronted about paying, he offered to pay $700 per week and make further purchases on a C.O.D. basis. Cornwell rejected this offer demanding payment in full or the return of all tools sent to Rodgers. On February 1, 1988, Cornwell terminated Rodgers as a dealer. Rodgers sold tools for another six months. He did not make any further payments to Cornwell on the outstanding indebtedness.

## DISCUSSION

A. Nondischargeability Based on False Credit Application.

Cornwell contends that Rodgers' debt is nondischargeable under § 523(a)(2)(B) because the Credit Application was materially

false and submitted by Rodgers so he could become a dealer for Cornwell.

Section 523(a)(2)(B) exempts from discharge any debt:

(2) [F]or money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

Pursuant to this section, Cornwell must establish that:

(1) the debtor obtained money, property, services or credit, (2) by a financial statement, (3) in writing, (4) concerning the debtor's or an insider's financial condition, (5) that the financial statement was materially false, (6) that the debtor caused it to be made or published with intent to deceive the creditor, (7) that the creditor relied on it, (8) that such reliance was reasonable, and (9) that the loss was the proximate result of the publication of the financial statement.

*In re Pascucci*, 90 B.R. 438, 445 (Bankr.C. D.Cal.1988); see also *In re Lansford*, 822 F.2d 902, 904 (9th Cir.1987).

The burden here is on Cornwell to establish each of these elements. *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir.1975). Each element must be proven by clear and convincing evidence. *In re Tilbury*, 74 B.R. 73, 77 (9th Cir. BAP 1987), *aff'd without opinion*, 851 F.2d 361 (9th Cir.1988). In order to preserve a debtor's "fresh start", exceptions to discharge are narrowly construed. *In re Houtman*, 568 F.2d 651 (9th Cir.1978).

Cornwell failed to prove by clear and convincing evidence that it reasonably relied upon the Credit Application. Cornwell asserts that it relied on Rodgers' representation that he had not been a bankrupt and if it had known that fact, it would not have made Rodgers a dealer and extended credit to him. This assertion is unconvincing. The national credit manager who testified that Cornwell relied on the Credit Application was not the credit manager of Cornwell when Rodgers became a dealer. Frankly, he had no personal knowledge of what transpired at the time.

The credit manager did, however, provide some helpful information regarding the application process at Cornwell. He testified that Cornwell's approach is to look for home ownership as a primary indicator of credit worthiness. The Credit Application clearly reflects that Rodgers did not own a home, yet despite this, Cornwell accepted Rodgers as a dealer. When this was pointed out to the credit manager, he acknowledged that the credit manager approving the Credit Application probably relied on the inheritance.

Rodgers testified that he had numerous discussions with Cornwell representatives prior to his completing the Credit Application. These occurred after Rodgers knew about the inheritance. Rodgers further testified that by late 1981 or early 1982 he had already been approved as a Cornwell dealer. Once the inheritance was received, he became a dealer. The Credit Application was, therefore, only a formality.

Even if the bankruptcy had been disclosed, it is unlikely that this would have prevented Rodgers from being approved as a dealer. The credit manager testified that just two months before trial, he had approved an applicant who had previously filed bankruptcy. In other words, a prior bankruptcy was not an absolute bar. Moreover, Rodgers had filed his bankruptcy almost 13 years prior to the time the Credit Application was submitted. Under these circumstances, Rodgers' bankruptcy would likely have had little affect on whether to accept him as a dealer.

Finally, the credit that was actually extended and the subject of this nondischargeability proceeding was extended six years after Rodgers became a dealer. During the six-year period, Rodgers had timely paid his bills. He had an excellent

credit history. Cornwell's credit experience with Rodgers was the most critical factor in continuing the relationship and extending credit. Nobody testified that Rodgers' file was pulled and the six-year old Credit Application reviewed before tools were shipped. In reality, the Credit Application had no relevance in 1987.

■ I should also point out that the evidence does not support a finding that Rodgers intended to deceive Cornwell when he submitted the Credit Application without disclosing his prior bankruptcy. According to him, he did not believe a 13–year-old bankruptcy was relevant to the process. Under the circumstances, his explanation is believable and it was not rebutted by contrary evidence.

Accordingly, I hold that Cornwell has not sustained its burden under § 523(a)(2)(B) by clear and convincing evidence.

### B. Nondischargeability Based upon Actual Fraud.

■ Cornwell also seeks to except the debt from discharge under § 523(a)(2)(A) which provides in pertinent part that:

(a) A discharge ... does not discharge an individual debtor from any debt— ...

(2) for obtaining money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—

(A) false pretenses, a false representation or *actual fraud*, other than a statement respecting the debtor's or an insider's financial condition.... (Emphasis added).

A cause of action under this provision requires that the creditor prove by clear and convincing evidence that: (1) the debtor made a representation; (2) at the time he made the representation, he knew the representation was false; (3) he made it with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representation; and (5) the creditor sustained the alleged loss and damage as the proximate result of the representation. *In re Dougherty*, 84 B.R. 653, 656 (9th Cir. BAP 1988).

In *Dougherty*, the debtor incurred $4,000 in credit card charges in a seven-month period. The creditor argued that these charges should be excepted from discharge because when the debtor incurred these debts, he had no intent to repay. In holding for the creditor, the court stated that "Where purchases are made through the use of a credit card with no intention *at that time* to repay the debt, that debt must be held to be nondischargeable pursuant to section 523(a)(2)(A)." 84 B.R. at 657 (quoting *In re Faulk*, 69 B.R. 743, 753–54 (Bankr.N.D.Ind.1986) (Emphasis added). The court went on to state that the creditor must "[P]rove by clear and convincing evidence that 'the debt was incurred through actual fraud, i.e., where the debtor made the changes with no intention of paying for same.' " *Id.*

The *Dougherty* court recognized that it is often difficult to ascertain the debtor's intent. To assist the trial court make this determination, it set forth a nonexclusive list of factors that should be considered. From that list there are three that are relevant to this proceeding: (1) the amount of the charges; (2) the financial condition of the debtor at the time the charges are made; and (3) whether there was a sudden change in debtor's buying habits. *Id.*

Here, the amount of the charges increased substantially within a six-week period. Before October 2, 1987, Rodgers averaged $643.92 per week in purchases over a 34–week period. During the next six weeks, however, the weekly average was $3,743.25.

Rodgers testified that he purposely increased the amount of his purchases in response to threats by Cornwell's representatives that they would terminate him as a dealer if he did not order more tools. Rodgers also testified that he wanted to stockpile tools in the event he was terminated as a Cornwell dealer. Rodgers' financial condition was not good. Rodgers testified that he did not purchase many tools prior to October 2 because he was having difficulty selling the tools he had on hand. The evidence shows that Rodgers' net income for the year was only $1,893.

Moreover, Tools on Wheels was Rodgers only source of income.

Rodgers responds that he intended to pay for the tools, but he was unable to do so. Rodgers testified that he offered to pay Cornwell $700 per week until the debt was completely paid. Cornwell, however, refused to accept this offer and demanded payment in full immediately or the return of the tools. Rodgers did not comply with either request.

Rodgers testified that when he placed the orders he was fully aware of his financial predicament and knew that he could not possibly pay for the tools according to the terms of the Agreement. He hoped that he could arrange some alternate form of payment.

■ Rodgers argues that his intent to pay at some time in the future is sufficient to preclude a finding of actual fraud. The issue then is whether an intent to pay at substantial variance from the express terms of the Agreement constitutes actual fraud.

The *Dougherty* court did not address this issue. *Dougherty* held that actual fraud exists where the debtor at the time of the charges had no intent to pay. A later case, *In re Karelin,* 109 B.R. 943 (9th Cir. BAP 1990), is helpful. In *Karelin,* the debtor obtained cash advances to gamble. The debtor obtained a cash advance on her credit card in the form of a cashier's check payable to a casino, used the check to pay down her existing debt to the casino, and then gambled on the new credit extended by the casino. On her return, to the extent she had some funds, she made a payment on her credit card account. The trial court found that at the time she accepted the cash advances she was "hopelessly insolvent" with a negative net worth of $400,000.

The court concluded that the debtor "[M]ust have been aware of the extent of the debt she was incurring by taking the cash advances, and that she could not possibly have failed to perceive the hopelessness of repaying the resulting obligation." *Id.* at 947. Given this, the court concluded that the debtor had no intention to pay in

accordance with the *Dougherty* standard. *Id.* at 948.

In another case, *In re Salett,* 53 B.R. 925 (Bankr.D.Mass.1985), the creditor, a meat supplier, asserted that the debt was incurred under false pretenses and it should be declared nondischargeable pursuant to § 523(a)(2)(A). The debtor had ordered meat costing approximately $32,000. The invoice provided that full payment was to be made within seven days. At the time of the order, the debtor had a buyer for the meat. Debtor received payment from the buyer, but instead of paying on the line of credit, debtor used the money to finance his operations. When the creditor requested payment, the debtor responded that he was undergoing business difficulties and that he could not pay according to the terms of the agreement. He was, however, willing to pay off the line of credit by making $200 installments until fully paid. Debtor made only five payments prior to going out of business.

During the prior two years, the debtor made over $500,000 in purchases and had paid all but the final order. In holding the debt dischargeable the court found that the debtor intended to pay for the goods at the time of the purchase and *had the ability to fulfill the terms of the agreement when the order was placed. Id.* at 928. (Emphasis added.)

The court suggested a different result, however, if the debtor had known that he could not fulfill the terms of the agreement. The *Salett* court stated that "[O]nly where one purchases goods on credit knowing he does not intend to pay for the goods *or knowing he is unable to comply with the payment requirements of the contract, does he fraudulently obtain the goods, making the debt nondischargeable." Id.* (Emphasis added.)

Here, Rodgers has admitted that he could not pay according to the terms of the Agreement. Furthermore, given his financial condition, it was highly unlikely that he would be in a position to pay on the debt in the foreseeable future. His offer to pay $700 per week in light of his monthly net

income of $387 is a feeble attempt to justify what he did. When Rodgers placed the purchase orders, he impliedly represented that he would pay in accordance with the terms of the Agreement. Cornwell reasonably relied upon this representation in shipping the tools. A contrary result would undercut commercial agreements of this type. Accordingly, I hold that the debt is nondischargeable.

Separate findings of fact and conclusions of law with respect to this ruling are unnecessary. This memorandum opinion shall constitute my findings of fact and conclusions of law.