**In re Vickie Rene BARTLETT, Debtor.**

**FCC NATIONAL BANK,**

**and**

**ITT Financial Services,**

**and**

**AVCO Financial Services of Rolla, Inc.**

**and**

**United Missouri Bank, N.A.,**

**and**

**Mercantile Bank of Illinois, N.A., Plaintiffs,**

**v.**

**Vickie Rene BARTLETT, Defendant.**

**Bankruptcy No. 90–42082.**
**Adv. Nos. 91–4024–3, 90–4205–3, 90–4206–3, 90–4221–3 and 90–4207–3.**

United States Bankruptcy Court, W.D. Missouri, Kansas City Division.

June 18, 1991.

Cynthia F. Grimes, Kansas City, Mo., for FCC Nat. Bank.

Timothy A. McNearney, Overland Park, Kan., for ITT Financial Services and AVCO Financial Services of Rolla, Inc.

Mark J. Schultz, Kansas City, Mo., for United Missouri Bank, N.A. and Mercantile Bank of Illinois, N.A.

Scott P. Cline, Independence, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Five separate creditors of this debtor have objected to the dischargeability of their debts under 11 U.S.C. § 523(a)(2)(A) and (B). The bulk of the cash advances and borrowings from these five creditors was gambled away, primarily by the debtor's husband. I find that the debtor incurred these charges with no intention of repaying these creditors, and that the debts due such creditors are not dischargeable.

Prior to 1989 the debtor was employed at Hallmark Cards in Kansas City. In that year, she quit her job there, and moved in with one Rex Bartlett, who had recently become divorced from a prior wife. Since then, she has not been regularly employed, but rather works when needed by Mr. Bartlett in his business. Mr. Bartlett himself has filed personal bankruptcy twice in the past, the most recent being in 1989. During 1988, the debtor and Mr. Bartlett had taken a number of gambling trips to Las Vegas, during some of which the debtor testified that she observed him win large amounts of money.

At the time the debtor left Hallmark, she was the beneficiary of a retirement fund with assets of approximately $40,000.00. In January 1990 she withdrew these funds, as a result of which she owed taxes in excess of $7,000 to the Internal Revenue Service. She did not pay those taxes, but instead gave $10,000 to Mr. Bartlett to be paid to his ex-wife as part of their divorce settlement. Another $10,000 was used to purchase an IRA. The bulk of the remaining funds were gambled away by Mr. Bartlett on various trips to Las Vegas.

Mr. Bartlett owns a heating and cooling company. That business was suffering in late 1989 and early 1990. Prior to that time he had been in the practice of giving the debtor $500.00 per week cash for spending money and household expenses. As his problems worsened, those payments became erratic.

In February 1990 the debtor and Mr. Bartlett went to Las Vegas and stayed at the Stardust Hotel, as they had previously. The Stardust is listed as a creditor in this bankruptcy case in the amount of $8,004.00. On Friday, February 16, 1990, while in Las Vegas, they were married. Altogether they had gambling losses of $2–$3,000 on that wedding trip. The Bartletts were still married and living together as of the time of trial.

█ It is upon returning from that trip that the debtor's problems multiplied. On February 20, Mrs. Bartlett went through the Kansas City phone book looking for loan companies which might lend her money. Mr. Bartlett himself was unable to obtain credit due to his recent bankruptcy. On February 20, Mrs. Bartlett applied to two companies, AVCO and HFC. On the written application submitted to AVCO she informed them that her name was Vickie Lampton, and that she had been employed at Bartlett Heating and Cooling since March 1989. She also stated that her weekly salary was $500.00 per week, and to prove it produced a company check in that amount, signed by her husband, and dated February 16, 1990. It turns out that such check was never cashed by her, and was apparently created solely to give her the appearance of having a stable source of income. Her tax returns filed for 1989 do not reflect any income from Bartlett Heating and Cooling. And, neither the Statement of Financial Affairs nor the Statement of Current Income and Expenses filed with the Court show any income from Mr. Bartlett's business.[1] The financial statement given to AVCO, in addition to misstating her income, also failed to list her debt due to the Stardust Hotel.

Mrs. Bartlett advised AVCO that she would give it, as additional security for its loan, a lien on her 1985 Pontiac. She stated that the title to such car had been stolen, and that she would bring the replacement to AVCO as soon as it was obtained. Based on the representations made in the application, as well as the promised lien on the vehicle, AVCO advanced $3,500 to her. Of that, $2,500 was given to her husband, who took another trip to Las Vegas and lost it gambling. Four days after obtaining the loan from AVCO, she traded in the 1985 Pontiac that was to be pledged to AVCO, and the remaining $1,000 in loan proceeds, for a new car. Altogether, the debtor made two payments of $138.00 each to AVCO, and as of the date of her bankruptcy owed them a total of $3,425.44.

Also on February 20, 1990, Mrs. Bartlett contacted HFC. She advised HFC that she needed the borrowed funds in order to pay the tax liability resulting from cashing in her pension monies. However, when she received the HFC loan proceeds she did not in fact pay her taxes. Instead, at least $1,500 out of those proceeds were given to Mr. Bartlett and were lost gambling. HFC did not file a dischargeability complaint.

Prior to February 20, 1990, the debtor had used her Mastercard and her Visa charge card only sporadically. On February 25, she used her United Missouri Bank Mastercard to wire $2,085 to Mr. Bartlett, who was at the time in Las Vegas. The same credit card was used for another wire the following day in the amount of $547.00, also to Mr. Bartlett. As of the date of the bankruptcy filing there was a total due United Missouri of $2,909.02, including interest.

Similarly, the debtor made extensive use of her Mercantile Bank Visa card in Janu-

---

1. The Court considered taking steps to dismiss Mrs. Bartlett's case as a substantial abuse under Section 707(b) of the Bankruptcy Code. (11 U.S.C. § 707) However, that Section was intended to be used where a debtor had the ability to make payments to her creditors in a Chapter 13 case, and not simply discharge her debts. Here, however, the debtor is not eligible for Chapter 13 because she does not have a regular source of income. 11 U.S.C. § 109(e). Therefore, dismissal under Section 707(b) is not appropriate.

ary and February, 1990, wiring a total of $3,544.25 to Las Vegas. In addition, she herself obtained $1,453.00 from money machines located at the Stardust Hotel during February and March of that year. As of the date of the filing, there was a total of $1,800 due Mercantile–Visa.

On April 4, 1990, Mrs. Bartlett obtained a loan of $2,309.07 from ITT Financial Services. In order to be eligible for such loan, she was required to demonstrate proof of current annual gross income of $12,000 or more. To do so, she brought to ITT an affidavit, signed by Rex Bartlett, stating that Mrs. Bartlett "is in business with me as Bartlett's Heating and Cooling and her yearly income is approximately $24,000." As previously indicated, Mrs. Bartlett's 1989 and 1990 income tax returns show no such income. After obtaining such funds, Mrs. Bartlett made one payment to ITT, in the amount of $92.00. ITT was owed $2,530.22 as of the date of the bankruptcy filing.

On May 8, 1990, the debtor used another credit card, this one issued by FCC National Bank, First Card, to obtain $1,975.00 at the Hilton Hotel in Las Vegas. Those proceeds were used for gambling. The balance due as of the filing date was $2,104.90.

A review of the debtor's bankruptcy schedules demonstrates that as of January, 1990 she had a total of approximately $12,500 in debts. However, by June 1990, her unsecured debts were $39,241.03. Of that total, all but $5,530.61 are owed either to credit card companies or represent gambling debts. Of the credit card debt, a substantial share represents funds lost gambling. The debtor did not advise any of the finance or credit card companies that she intended to use, or allow their loan proceeds to be used, for gambling.

In her testimony, Mrs. Bartlett stated that she thought that she could pay the debts described above in one of two ways. First, she thought there was a possibility that one good gambling trip would result in sufficient winnings to get her husband out of debt, as well as paying back the debts she herself was incurring. Second, she stated that she thought that her husband's heating and cooling business might pick up so that the debts could be paid from business income. Given the entire circumstances described above, I conclude that the debts owing by Mrs. Bartlett to the each of the Plaintiffs were incurred without any reasonable intention of repayment. This is evidenced by the misleading statements used in obtaining the funds, the uses of the funds, the hope that gambling winnings would cover the debts, debtor's lack of outside income, and the absence of any facts supporting any hope that the heating and cooling business would generate sufficient monies to repay the debt.

■ With respect to the debts owing to AVCO and ITT, the determination of dischargeability is dependent upon 11 U.S.C. § 523(a)(2)(B), which provides:

A discharge under section 727(a), ... of this title does not discharge an individual debtor from any debt—for money, property, services, or an extension, renewal of refinancing of credit, to the extent obtained by—use of a statement in writing—that is materially false; respecting a debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and that the debtor made or published with intent to deceive; ...

Debtor's written statements submitted in support of her loan request—written applications, financial statements, the check and the affidavit—were materially and substantially inaccurate. *In re Bundy*, 95 B.R. 1004, 1008 (Bankr.W.D.Mo.1989) (B.J. Koger). Omissions from the written statements constitute material falsity. *In re Kroh*, 89 B.R. 808 (Bankr.W.D.Mo.1988) (B.J. See). The creditors reasonably relied upon the written statements, as they would not have made the loans without the information and would not have made the loans had the true facts been known. *Bundy*, 95 B.R. at 1008. Intent to deceive may be inferred from all of the circumstances surrounding the transactions. *In re Kroh*, 88 B.R. 972 (Bankr.W.D.Mo.1988) (B.J. See).

As I previously stated, the entire circumstances show that debtor had no intention of repaying this debt, and as such, there is requisite intent to deceive AVCO and ITT. Furthermore, the evidence demonstrates that she and Mr. Bartlett intended to deceive both companies about her income. Just because she helps out in his business, and he gives her $500 to pay household expenses—when the funds are available—does not mean that she has income of $500 per week. Her tax returns as well as the Bankruptcy Court filings show no income. Based on all these facts, an intent to deceive has been proven.

■■■ With respect to the credit card debts owing to FCC National Bank, United Missouri Bank, and Mercantile Bank of Illinois, the determination of dischargeability is dependent upon 11 U.S.C. § 523(a)(2)(A), which provides:

> A discharge under section 727(a), ... of this title does not discharge an individual debtor from any debt—for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—false pretenses, false representation, or actual fraud, ...

Fraudulent intent under Section 523(a)(2)(A) may be inferred from the surrounding circumstances. *In re Van Horne*, 823 F.2d 1285 (8th Cir.1987). The elements that must be established under Section 523(a)(2)(A) are: 1) that the debtor made representations; 2) that at the time they were made debtor knew them to be false; 3) that the representations were made with the intention and purpose of deceiving the creditor; 4) that the creditor relied on the representations; and 5) that the creditor suffered a loss as a proximate result of the representations. *In re Ophaug*, 827 F.2d 340, 342 (8th Cir.1987).

■■■ The key elements in this case are the representation, and the intent to deceive. Credit card purchases carry the representation that the buyer has the means and intention of repaying the charge. *In re Hinman*, 120 B.R. 1018 (Bankr. N.D.1990). Credit card charges made or cash advances received by individuals who never intended to repay the charges or advances, or by those who knew they would be unable to repay the charges, have been held to be nondischargeable under § 523(a)(2)(A). *In re Karelin*, 109 B.R. 943 (9th Cir. BAP 1990). *Karelin* is especially relevant to the present dispute, since it involved the dischargeability of credit card cash advances made for the purpose of gambling. In that case, the Bankruptcy Appellate Panel concluded that the debtor's hopeless financial condition was ample evidence of an inability to pay, and that she must have been aware of the extent of the debt that was being incurred. *Karelin*, 109 B.R. at 947. Furthermore, her hope of repaying the debt from her potential gambling winnings did not prove that she had the requisite intent to repay. *Karelin*, 109 B.R. at 948. Since she was aware of her inability to pay, her representation to the contrary was false, and was made with the intention and purpose of deceiving the credit card company. Similarly, *Hinman* shows that the lack of regular income to repay credit card purchases and cash advances evidences inability to repay and, as such, is satisfactory proof that the intent to repay is lacking. *Hinman*, 120 B.R. at 1022.

In the present case, there is substantial evidence from which Mrs. Bartlett's intent can be inferred. The credit card advances were taken for the purpose of gambling, and were to be repaid either through gambling winnings or business income. The evidence did not include any facts showing that she had a reasonable basis to believe that the heating and cooling business would pick up in time to repay her debts. Similarly, Mrs. Bartlett did not have a reasonable basis for believing she would be able to repay her debts through gambling winnings. She testified that she had seen Mr. Bartlett win substantial sums at the tables before. But obviously, she was well aware that he had lost substantial sums as well, including a chunk of her own pension money. Just because she hoped that he would be able to win enough to pay off his debts, as well as her own, doesn't give her the requisite intent to repay. *Karelin*, 109 B.R. at 948. Mrs. Bartlett made implied representations to these credit card companies that she intended, and had the ability

to, repay these debts. She made those representations knowing them to be false, with the intention and purpose of deceiving such creditors. The creditors relied on those implied representations in advancing the funds, and suffered losses as a result.

Accordingly, I conclude that each of the creditors in the above-captioned complaints has satisfied its burden, and that their respective debts shall not be discharged. This Memorandum Opinion and Order shall constitute findings of fact and conclusions of law under Federal Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52. The Clerk of Court shall prepare a separate judgment for each of the prevailing creditors, granting a nondischargeable judgment in the following amounts:

1. FCC National Bank—$2,104.90;
2. ITT Financial Services—$2,530.22;
3. AVCO Financial Services of Rolla, Inc.—$3,425.44;
4. United Missouri Bank—$2,909.02; and
5. Mercantile Bank of Illinois—$1,800.00

IT IS SO ORDERED.