**In re J.W. Andre BUSTAMANTE, Debtor.**

**Consumer United Insurance Co., in Liquidation, Plaintiff,**

v.

**J.W. Andre Bustamante, Defendant.**

**Bankruptcy No. 98–16561.
Adversary No. 99–1027.**

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Oct. 1, 1999.

William M. Cusmano, Brooks Suiters & Sattler, Arlington, VA, for debtor.

R. Timothy Coerdt, Baker & Hostetler, Stephen Hobt, Cleveland, OH, for plaintiff.

### MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

The Plaintiff, Consumer United Insurance Company, in Liquidation (CUIC) filed the above-styled adversary proceeding to have the Court determine the dischargeability of a certain debt owed to it by the Defendant J.W. Andre Bustamante (the Debtor). Relief is sought under provisions of § 523(a)(2)(A) and (B), (a)(4) and (a)(6) of the Bankruptcy Code [11 U.S.C. § 523(a)(2)(A) and (B), (a)(4) and (a)(6)].

Core Jurisdiction of this matter is acquired under provisions of 28 U.S.C. § 157(b)(2)(A)(I) and (O), 28 U.S.C. § 1334, and General Order No. 84 of this district.

The Amended Complaint alleges that the Debtor was a principal of an Ohio Corporation known as Bottom Line Productions, Inc. (Bottom Line). Disputedly, the Debtor was an officer, director, and shareholder of the closely held corporation. The debt in question concerns a $725,000.00 promissory note (the Note) co-executed on November 27, 1987 by the Debtor and his father, John H. Bustamante, on behalf of Bottom Line and in favor of CUIC. Thereon, the Debtor signed in a representative capacity as "Vice President and Assistant Secretary" of Bottom Line. Ultimately, Bottom Line defaulted on this obligation, with a state court judgment taken against it in the amount of $795,766.30 including principal and interest. Subsequently, a state court judgment was

taken against the Debtor on his individual endorsement on the Note.

The Court must determine whether any conduct attributed to the Debtor would render any obligation he has on the Note nondischargeable under applicable bankruptcy law.

*Section 523(a)(2)(A) Allegations*[1]

■ The type of conduct which would render a debt nondischargeable under § 523(a)(2)(A) is equivalent to common law fraud:

1. The debtor must have made a false representation. [In the Sixth Circuit, that misrepresentation must be a material misrepresentation. See *In re Brady,* 101 F.3d 1165, 1172 (6th Cir.1996).].

2. At the time of making the misrepresentation, the debtor must have had knowledge of its falsity and intent to deceive. This knowledge and deliberate purpose of deceit is referred to as "scienter".

3. The creditor must have justifiably relied on the false representation in entering into the transaction—it must have been induced by the misrepresentation to give the debtor the money, property, services, or credit.... See, *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)....

4. The misrepresentation must have resulted in some injury.[2]

■ A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. This, by itself, does not constitute fraudulent conduct warrant-

ing nondischarge. See, *In re Karelin,* 109 B.R. 943, 947–48 (9th Cir. BAP 1990).

■ In the Sixth Circuit:

In a proceeding under § 523(a)(2)(A), a plaintiff must demonstrate that the debtor obtained money through a *material* misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. *In re Brady,* 101 F.3d 1165, 1172 (6th Cir.1996), citing, *In re McLaren,* 990 F.2d 850, 852 (6th Cir. 1993) quoting, *In re Phillips,* 804 F.2d 930, 932 (6th Cir.1986). (Emphasis added).

■ Herein, the record is silent to show where the Debtor made any representations to CUIC to induce CUIC to extend credit. Certainly, there were no material misrepresentations. No evidence reflects that he negotiated the loan, presented any appraisal information pertaining to collateralized property, made any concealments, or that CUIC justifiably relied on the Debtor for any repayment on the Note. Additionally, respecting the several checks exhibited on the Bottom Line checking account, there was no evidence adduced to show that the Debtor was not an authorized signatory on the account or committed any other wrongful act regarding the account which was in violation of applicable law. At most, CUIC's allegations in these regards are conclusory and unsubstantiated.

In support of its dischargeability Complaint, CUIC alleges that:

1. Fraudulent representations of [the Father] induced an *earlier* debt for which the Note *represented an ex-*

---

1. A discharge under section 727 ... does not discharge an individual debtor from any debt—
 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
 (A) false pretenses, a false representation or actual fraud, other than a statement re-

specting the debtor's or an insider's financial condition.

2. Blum, B.A. *Bankruptcy and Debtor/Creditor,* Aspen Law & Business: § 22.54, p. 477 (1999).

*tension, renewal, or refinancing.* (Complaint ¶ 9) (Emphasis added).

2. [The Father] in 1986 requested a $275,000.00 loan from CUIC to develop an oil field on certain Ashtabula County, Ohio property owned by the Father or Bottom Line. (¶ 10).

3. In order to induce CUIC to make the loan, [the Father] and/or Bottom Line procured an alleged deceptive, inflated, and fraudulent appraisal of the Ashtabula property and allegedly misrepresented the intent and ability of the Father and/or Bottom Line to perform the represented business activity with the loan proceeds. (¶ 11).

4. In reliance on the materials submitted by [the Father] and/or Bottom Line, CUIC lent *the Father and/or Bottom Line* $275,000.00 on or about *May 1, 1986.* (¶ 12) (Emphasis added).

5. Bottom Line and/or [the Father] diverted most of the loan proceeds for [the Father's] personal benefit and not for the purposes represented. (¶ 13).

6. On or about *July 8, 1987,* [the Father] and/or Bottom Line made an interest payment to CUIC on the Note. (¶ 14) (Emphasis added).

7. On or about *October 1, 1987,* [the Father] and/or Bottom Line wrote to CUIC requesting *additional* funds in the amount of *$450,000.00,* falsely representing that he and/or Bottom Line had sustained a loss in excess of $500,000.00 from a security interest [the Father] and/or Bottom Line had arranged on a previously under-collateralized CUIC loan to another party. The security interest had been granted on certain real property on St. Clair Avenue and East 105th Street in Cleveland, Ohio (*"the St. Clair Avenue property"*) (¶ 15) (Emphasis added).

8. .... *[The Father]* and/or Bottom Line wanted to induce CUIC to lend more money.... (¶ 16) (Emphasis added).

9. In his/its efforts to induce CUIC to lend more money, [the Father] and/or Bottom Line procured a deceptive, inflated, and fraudulent appraisal on the St. Clair Avenue property, showing that the entire property had a value of $471,000.00.... (¶ 17).

10. Unknown to CUIC, instead of possessing the substantial positive value represented by the [Father] and/or Bottom Line, the St. Clair Avenue property had sustained ruinous damage, had been condemned, and was to be razed by the City of Cleveland. (¶ 18).

In similar manner, the Complaint alleges that the Father and/or Bottom Line misrepresented the intent and ability of the Father and Bottom Line to perform the represented business activity with the loan proceeds (¶ 19). Further, CUIC relied upon representation of *the Father* and/or Bottom Line when it agreed to lend Bottom Line an additional $450,000.00 (¶ 20). This $450,000.00 was combined with the remaining principal of the May 1, 1986 loan ($275,000.00) to create the $725,000.00 Note that was executed on November 27, 1987 (*Id.*). The proceeds of the Note were used by the Father for his personal benefits or that of others (¶ 21). (Emphasis added).

Only in Complaint Para. No. 22 does CUIC begin to implicate the Debtor in this matter where it is alleged that the Debtor was involved in obtaining a stay of demolition of the St. Clair property, and that he continued to conceal from CUIC the property's true value and condition (¶ 23). Indeed, the Complaint acknowledges that it was the Father and/or Bottom Line—not the Debtor who promised CUIC that the Note would be repaid by the end of 1989 (¶ 24).

The latter allegations were conclusory as no evidence was adduced to substantiate

them at trial. The following Complaint allegations, likewise, were not established by the required standard of proof:

1. That the Bustamantes and/or Bottom Line sold timber securing the Note which diminished CUIC's collateral (¶ 26);

2. The Debtor and others misrepresented to CUIC the success of certain oil drilling operations (¶ 27);

3. That the Debtor and others diverted revenues from Bottom Line to other entities rather than repaying CUIC (¶ 28);

4. That the Debtor abridged or violated certain fiduciary obligations to creditors (¶ 19);

5. That the Debtor knew or should have known of the nature and affect of his Father's and Bottom Line's representation (¶ 30);

6. That the Debtor knew or should have known that the prior loan of May 1, 1986 was procured and maintained through fraud; that the business activity of Bottom Line had been misrepresented; that borrowed funds and/or business proceeds of Bottom Line had been squandered or misappropriated; that there was an intent to squander and/or misappropriate borrowed funds; that the value of the collateral securing the Note had been represented; that neither principal of Bottom Line had any intent of repaying the loan; that the execution of the Note constituted a fraud on CUIC; and that the failure to repay the debt would result in willful and malicious injury to CUIC (¶ 31).

As one noted commentator opined:

Care must be taken to stop short of a rule that would make every desperate, financially strapped debtor a guarantor of his ability to repay, on pain of nondischargeability.[3]

The majority of charges of alleged wrong doing alleged by CUIC are not leveled at the Debtor, rather, they are leveled against the Debtor's father. The Debtor's father, notedly, is not a co-debtor in this case. Thusly, the § 523(a) allegations are misapplied respecting the Debtor's father.

A case for nondischargeability of the subject Note respecting the Debtor's liability thereon has not been proved by a preponderance of the evidence. See, *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Even from the outset of the Plaintiff CUIC's case-in-chief, its counsel expressed no certainty that the Debtor made misrepresentations in the matter:

[CUIC] is not saying, and you could not say, that Andre Bustamante [the Debtor] has made any specific representations to [CUIC] in that he negotiated the loan. He did not negotiate the loan and make false representation in this sense. (Opening Statement, Atty. W.M. Cusmano).

It was even clearer that CUIC's principal focus was on alleged acts of misconduct committed by the Debtor's father who, as noted above, is not a debtor in bankruptcy. With CUIC's concession that the Debtor made no misrepresentation, CUIC cannot sustain its burden of proof to satisfy the required elements under § 523(a)(2)(A) which must be proved conjunctively.

The Debtor, J.W. Andre Bustamante, was a twenty-six year old college graduate when he co-signed the Note with his father in 1987. He acknowledged signing the second page of the Note (Exh. 18–2) which personally obligated him on the Note. He signed the Note at the request of his father. Unrefutedly, he had never signed a note of this magnitude and did not question his father regarding the Note or its purpose. (Debtor Cross Exam).

The Debtor's involvement in Bottom Line can be described, at best, as being

---

**3.** Epstein, D.G., et al., *Bankruptcy*, West Pub. Co., P. 500 (1993).

peripheral. His position with the Company was that of "Vice President and Assistant Secretary." He repeatedly testified that his complete dealings with the Company were made on his father's instructions. On the $725,000.00 consolidated Note, he co-signed with his father in a representative capacity as an officer of Bottom Line. (Exh. 18–1). Only his father, John H. Bustamante, signed as the guarantor on the Note. (Id., Exh. N; Lehrfeld, B., Cross–Exam.).

The Debtor was examined extensively regarding various checks drafted or signed by him on the Bottom Line bank account. Of the numerous checks exhibited, he acknowledged which checks were drawn and signed by him, as well as checks drafted and signed by his father. Undisputedly, only two checks were in question which showed a personal benefit to the Debtor. One check was for a personal loan which he repaid Bottom Line. The second check drawn by the Debtor and made payable to him was for travel-related expenses he incurred during the clean-up of certain oil properties owned by his family. No evidence was adduced to refute those explanations. In brief, CUIC presented no persuasive evidence to show that the Debtor diverted loan proceeds which were for purposes contrary to a stated purpose of the loan. Indeed, an examination of the Note will reveal no stated purpose is contained therein for the loan. (See, Exh. 18–1; Bustamante, John H., Cross–Exam.). Thusly, no false statement, representations or fraud have been shown by CUIC in this regard respecting the Debtor.

CUIC alleged that the Debtor concealed information regarding the condition of the St. Clair Avenue property and its value. This property served as partial collateral on the subject loan. The evidence does not support CUIC's allegation. The Debt-

or's unrefuted testimony revealed that CUIC sent its agent Phil Johnson (Johnson), to Cleveland to inspect the St. Clair property. The Debtor personally transported Johnson to the St. Clair property, whereupon Johnson was afforded an opportunity to walk upon the premises to inspect it. No evidence was shown to demonstrate that the Debtor or anyone impeded the scope or duration of Johnson's inspection of the St. Clair property. (Bustamante, John H., Cross–Exam.). Thusly, CUIC's allegation that the Debtor concealed information regarding the condition of the St. Clair property is unsupported in the record.

Similarly, CUIC's allegation attributing improper valuation of the St. Clair property to the Debtor is also unsupported by the required standard of proof. Two appraisals of the St. Clair property were exhibited. Both were obtained by the Debtor's father and were presented to CUIC. No evidence attaches the Debtor to either appraisal. Moreover, CUIC showed no appraisal reports of its own to provide contrary appraisal information. Further, the same St. Clair property had been used as loan collateral for loans CUIC had made to the previous owner of the St. Clair property. Thusly, for CUIC to posit that it was caused to wrongly rely upon valuation data provided by the Debtor is unjustifiable and is not supported by the evidence.

*Section 523(a)(2)(B), (a)(4) and (a)(6) Allegations*

Plaintiff CUIC also alleges that the subject debt is nondischargeable pursuant to provisions of § 523(a)(2)(B), (a)(4) and (a)(6) of the Bankruptcy Code. Section 523(a)(2)(B) is the proper subject of a dischargeability action only when the debt was induced by a materially false written financial statement.[4] In the present pro-

---

**4.** § 523 Exceptions to discharge.
 (a) A discharge under section 727 ... does not discharge an individual debtor from any debt—
 (2) for money, property, services, or an extension renewal, or refinancing of credit,

to the extent obtained by—(B) use of a statement in writing: (1) that is materially false; respecting the debtor's ... financial condition....

ceeding, CUIC introduced no writing respecting the Debtor's financial condition which would trigger a basis for nondischargeability under subsection (a)(2)(B). Indeed, CUIC never required the Debtor's signature to appear on the Note:

> And no one from [CUIC's] side said to make sure Andre Bustamante's name's on the note too. (Opening Statement, Atty. W.M. Cusmano); (See, also, Bustamante, John H., Cross–Exam.).

Accordingly, § 523(a)(2)(B) is not applicable herein.

 Under subsection (a)(4), a successfully maintained dischargeability action must necessarily establish that the debt in question arose out of the debtor's dishonesty as a fiduciary or from embezzlement or larceny. See, 11 U.S.C. § 523(a)(4). The term "fiduciary" under (a)(4) applies only to express or technical trusts and does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). In this proceeding, no existence of an express or technical trust was shown to qualify the Debtor as a fiduciary for (a)(4) purposes. The requisite trust relationship must exist prior to the act creating the debt and without reference to it. *Id.* at 333–34, 55 S.Ct. 151.

 Further, no evidence was shown by CUIC to establish acts of embezzlement or larceny by the Debtor. Larceny is established under § 523(a)(4) where it is proved that the debtor wrongfully and with fraudulent intent has taken property from its owner. See, *In re Rose*, 934 F.2d 901, 902 (7th Cir.1991). Herein, CUIC demonstrated no evidence to support an act of larceny by the Debtor.

 Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking. *Moore v. U.S.*, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895). As in all dischargeability actions, the burden of proof is upon the complainant to show by a preponderance of the evidence that the proscribed conduct has occurred. Other than its conclusory allegation, CUIC has presented insufficient evidence to prove that the Debtor committed embezzlement. A fully disclosed and repaid loan on Bottom Line's checking account made payable to the Debtor does not rise to a level of fraudulent intent required under § 523(a)(4) to establish embezzlement. Explicitly, the check memo fully disclosed and indicates that the $3,200.00 check was a loan on Bottom Line's account. (Exh. 12–42, Check No. 1065). It was undisputed that the Debtor repaid this loan in 1991. (Debtor, Direct). More significantly, this particular check was drawn prior (September 18, 1987) to the Debtor's co-execution of the Note. (November 27, 1987) (Exh. 18–1).

 Lastly, CUIC asserts that the Debtor's obligation on the Note is nondischargeable based on § 523(a)(6). Under § 523(a)(6), an individual debtor cannot obtain a discharge from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. In a recent decision, the U.S. Supreme Court addressed the pivotal question concerning the scope of the "willful and malicious injury" exception. The Supreme Court held that the term "willful" means "voluntary", "intentional" or "deliberate". As such, only acts done intentionally to cause injury—and not merely acts done intentionally—can cause willful and malicious injury. See, *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998); *In re Markowitz*, 190 F.3d 455 (6th Cir.1999). In the present proceeding, no evidence was presented to show that the Debtor committed any acts intentionally to cause injury to CUIC or to

anyone. Consequently, the relief sought by CUIC under § 523(a)(6) is misdirected.

*Conclusion*

Accordingly, CUIC failed to prove by a preponderance of the evidence that nondischargeability is appropriate under the § 523(a) subsections it relies upon. Thusly, the Debtor's personal liability on the Note is hereby determined to be a dischargeable obligation. Judgment and costs are rendered in favor of the Defendant Debtor.

IT IS SO ORDERED.