In re David POSKANZER and David Poskanzer Mortgage Company, Debtor.

TRUMP PLAZA ASSOCIATES, d/b/a Trump Plaza Hotel & Casino, Plaintiff,

v.

David POSKANZER, Defendant.

TRUMP CASTLE ASSOCIATES, d/b/a Trump Castle Casino Resort, Plaintiff,

v.

David POSKANZER, Defendant.

BOARDWALK REGENCY CORPORATION, d/b/a Caesars Atlantic City and Desert Palace, Inc., d/b/a Caesars Palace, Plaintiffs,

v.

David POSKANZER, Defendant.

Bankruptcy No. 90–24943.

Adv. Nos. 91–2104, 91–2228 and 91–2093.

United States Bankruptcy Court, D. New Jersey.

May 28, 1992.

---

Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, P.A. by Charles A. Matison, Atlantic City, N.J., for Trump Castle Associates.

Slater, Tenaglia & Helmer, P.A. by Richard L. Vitali, Marlton, N.J., for Trump Plaza Associates.

Pitney, Hardin, Kipp & Szuch by Timothy R. Greiner, Morristown, N.J., for Boardwalk Regency Corp. and Desert Palace, Inc.

Gross & Gross by Michael Gross, River Edge, N.J., for David Poskanzer.

## OPINION

WILLIAM F. TUOHEY, Bankruptcy Judge.

These consolidated adversary proceedings came before the court for trial on February 25, 1992. The issues raised involve the administration of the assets of the bankruptcy estate and the determination of the dischargeability of certain claims. As such, these are core proceedings as set forth by Congress in 28 U.S.C. §§ 157 *et seq.* The within opinion constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FINDINGS OF FACT

1. The debtor filed an individual voluntary petition for relief under chapter 7 of the United States Bankruptcy Code on November 7, 1990. The debtor has indicated that he and his daughter prepared this petition, without the assistance of counsel. (*See* Trump Castle's *Designation of Defendant's Deposition to be Offered into Evidence as Admissions,* inclusive of pp. 27–28.)

2. The trustee subsequently moved to convert the chapter 7 case to a chapter 11. This action was approved by an order of this court filed on May 17, 1991.[1]

3. According to the debtor's bankruptcy petition, he is engaged in the business of commercial real estate development and ownership. He lists his business names as Poskanzer Tulp Co., Fort Lee Executive Park, and David Poskanzer Mortgage Co., located in Fort Lee, New Jersey.

4. The debtor indicates that during the 1970's and 1980's, he amassed a personal fortune.

He developed hundreds of properties throughout the northeastern part of the United States valued at more than three hundred million dollars. By the mid–1980's he was celebrated as an icon in the real estate business in New Jersey. His name appeared on buildings and billboards, in newspapers and on television. (*See* debtor's *Trial Brief,* filed February 19, 1992, p. 1.) By all counts then, it is undisputed that the debtor is a experienced businessman, presumably familiar with financing and credit transactions.

5. The debtor admits to having incurred several large gambling debts at various casinos in October, 1990. (*See* debtor's *Trial Brief* and answers to verified complaints.) These casino creditors have filed adversary complaints against the debtor regarding the dischargeability of certain debts.

6. On October 2, 1991, the court entered an amended pre-trial order which consolidated adversary proceedings 91–2104, 91–2108, and 91–2228. These are complaints against the debtor made by: Trump Plaza Associates d/b/a Trump Plaza Hotel & Casino, ("Trump Plaza"); MGM Desert Inn, ("MGM"); and Trump Castle Associates d/b/a Trump Castle Casino Resort, ("Trump Castle"), respectively, as well as adversary proceeding 91–2052, a complaint made by Trump Castle against the trustee and the bankruptcy estate.[2]

7. The October 2, 1991 order also directed that related adversary proceeding 91–2093, a complaint filed by Boardwalk Regency Corporation d/b/a Caesar's Atlantic City, ("Caesars A.C."), and Desert Palace, Inc., d/b/a Caesar's Palace, Inc., ("Caesars Palace"), (collectively "BRC"), be tried be-

---

**1.** An appeal of this decision was made to the United States District Court for the District of New Jersey. In a letter opinion, filed with this court on May 20, 1992, the conversion of the case to a chapter 11 was affirmed by The Honorable Nicholas H. Politan.

**2.** Certain adversary complaints also named the bankruptcy trustee, inasmuch as they sought the surrender of casino gaming chips which were in the possession of the bankruptcy estate. These matters were all resolved prior to trial.

fore this court simultaneously with the aforesaid consolidated adversary proceedings.

8. The consolidated and related adversary proceedings were tried before this court on February 25, 1992, at the conclusion of which this court reserved its decision.[3] The parties were represented by the counsel of their choice, submitted pleadings and relevant evidence, and were allowed to supplement the record with additional briefs. Further, the parties stipulated on the record to the facts of the cases, with few exceptions, as submitted in their pleadings.

9. The findings of fact for the remaining adversary proceedings are discussed *seriatim.*

### TRUMP CASTLE

10. Trump Castle is a hotel-casino located in Atlantic City, New Jersey.

11. On April 17, 1991, Trump Castle filed a complaint against the debtor objecting to the discharge of its claim, designated as adversary proceeding number 91–2228. The debtor filed an answer on May 13, 1991. The facts underlying the complaint are as follows.

12. On or about October 13, 1990, the debtor went to the Trump Castle casino and obtained $200,000 worth of casino chips on credit. (*See* Trump Castle's *Complaint* and debtor's *Answer,* paragraphs 1–3.)

13. More particularly, the debtor signed five separate markers in varying denominations which totaled $200,000, in favor of Trump Castle. (*Id.*) These five markers were submitted into evidence at trial as exhibit TC–2.

**3.** Those counts of the adversary proceedings which were brought against the trustee seeking the surrender of casino gaming chips were settled prior to trial.

Trump Castle's case against the trustee, number 91–2052, sought the surrender of some $10,-000 in Trump Castle casino chips, which had previously been turned over to the trustee by the debtor. (The chips were apparently the remainder of some $200,000 worth of Trump Castle chips received by the debtor on or about

14. On the face of each check, the following language was pre-printed:

I represent that I have received cash for the above amount and that said amount is on deposit in said bank or trust company in my name. It is free from claims and subject to this check.

(*See* Trial Exhibit TC–2.)

15. The markers were drawn against the account number 101023456 at Midland Bank & Trust, ("Midland Bank"), information which was provided to Trump Castle by the debtor to supplement a credit application. (*See* debtor's *Answer,* paragraph 2, Trump Castle's *Supplemental Trial Brief,* p. 4, and Supplemental Trial Exhibit *Affidavit of Stan Pienta,* paragraph 8. *See also* Trial Exhibit TC–1, the debtor's Trump Castle credit application.) However, when Trump Castle attempted to negotiate the markers, they were returned by the drawee bank because there were insufficient funds in the account to cover the demand. (*See* Trump Castle's *Complaint* and debtor's *Answer,* paragraph 6.)

16. During the Rule 2004 Examination, the debtor stated that there were insufficient funds to cover the credit extension by Trump Castle at the time it was made:

Q. [by Mr. Matison] On October the 13th, 1990 when you signed the marker and it had the Midland Bank & Trust Company on it, did you have money in that account to cover, you had $10,000 in chips, let's use $190,000 in that account?

A. [by the debtor] No.

Q. Did you take any steps after October 13 to pay Castle back the $200,000 that you owed them?

A. I don't know what the question means.

October 13, 1990. Cross-reference case number 91–2228, *infra.*)

MGM's case against the debtor, 91–2108, was settled by a consent order, pending MGM's acceptance of the debtor's eventual proposed plan of reorganization.

Caesars A.C.'s case against the trustee, 91–2093, contained in count 3 of its *Amended Complaint,* was settled by the payment of $75,000 for the surrender of $395,000 in Caesars A.C. gaming chips.

Q. Did you contact Castle either orally or in writing regarding paying back any of the $200,000 that you owed them?

A. No.

Q. Did you take any steps to write out checks or any other financial documents to pay back any of the money that you owed them?

A. I went to other casinos and attempted to win.

(*See* Trump Castle's *Designation of Defendant's Rule 2004 Examination to be Offered into Evidence as Admissions*, inclusive of p. 71, lines 1–19.) It is additionally noted, though, that the debtor claims to have unsuccessfully attempted more conventional methods of raising capital to pay off these casino debts. (*Id.*, inclusive of p. 90.)

17. The debtor indicates that he lost most of the $200,000 worth of gaming chips while gambling. However, some $2,000 to $3,000 worth of chips may have been cashed on that date, a portion of which the debtor utilized to purchase a dress from a casino shop for his daughter. (*Id.*, inclusive of pp. 78–79.) Additionally, the debtor took some $10,000 worth of chips with him when he left the casino. (*Id.*, inclusive of p. 89.)[4]

18. Trump Castle therefore seeks to have its claim for $195,000[5] declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (B), and (C).

### TRUMP PLAZA

19. Trump Plaza is a hotel-casino located in Atlantic City, New Jersey.

20. On February 15, 1991, Trump Plaza filed a complaint in objection to the debtor's discharge of its claim, designated as adversary proceeding 91–2104.

21. It is stipulated that on October 19, 1990, the debtor went to Trump Plaza and received some $200,000 worth of gaming chips on credit to enable him to gamble at the Trump Plaza casino. (*See* Trump Plaza's *Complaint* and debtor's *Answer*, paragraphs 2–5.)

22. The debtor had been a credit patron of Trump Plaza since 1986. (*See* Trump Plaza's Supplemental Trial Exhibit, *Affidavit of Michael R. Marcynyszyn*, paragraph 3.)

23. More particularly, the debtor executed ten markers, each in the amount of $20,000, drawn against his account at Midland Bank, account number 101023456.[6] It is stipulated by the debtor that the Midland Bank account number was provided to Trump Plaza during a visit to the casino in October, 1990. (*Id.* at paragraph 3.)

24. The debtor admits that he gambled and lost many of the gaming chips. However, the debtor also contends that he may have taken with him approximately $100,000 worth of chips when he left the casino and later turned them over to the bankruptcy trustee. (*See* Trump Plaza's *Designation of Defendant's Deposition to be Offered into Evidence as Admissions*, inclusive of p. 121, lines 12–18.)

25. When Trump Plaza attempted to negotiate the checks, the drawee bank dishonored them because of insufficient funds in the debtor's account. (*See* Trump Plaza's *Complaint* and debtor's *Answer*, paragraphs 6–7.)

26. The court further notes the following exchange during the Rule 2004 Examination:

Q. [by Mr. Vitali] At the time that you signed the markers to Trump Plaza casino, was it your belief that there were sufficient moneys [sic] in account 101023456 at Midland Bank & Trust to cover the $200,000?

A. [by the debtor] No, I knew there wasn't.

---

**4.** The $10,000 worth of Trump Castle chips was ultimately surrendered to the casino by the trustee in exchange for a cash payment of $5,000. (See footnote 3, *supra*.)

**5.** This sum is derived from the original extension of credit by Trump Castle in the amount of $200,000, less the $10,000 worth of chips surrendered by the bankruptcy estate, plus the $5,000 cash payment required for the surrender of the chips. (*See* Trump Castle's *Supplemental Trial Brief.*)

**6.** These ten markers were submitted at trial as exhibit TP–2.

Q. At the time you signed the markers to Trump Plaza casino, were you aware of the fact that you were already indebted to any other casinos?

A. Yeah, I might have been.

Q. Isn't it a fact that you were already indebted to Trump Castle for the sum of $200,000?

A. Yes, I think that's true.

(*See* Trump Plaza's *Designation of Defendant's Deposition to be Offered into Evidence as Admissions,* inclusive of p. 124, lines 11–25.)

27. Trump Plaza alleges that the debtor executed the credit slips knowing that there were insufficient funds in his bank account to honor the checks; that the debtor never intended to repay the debt; and that this was the result of false pretense, false representation, and actual fraud committed by the debtor.

28. Trump Plaza therefore seeks to have its claim in the amount of $200,000 declared nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (C), as well as interest and costs.

### CAESARS PALACE

29. Caesars Palace is a hotel-casino located in Las Vegas, Nevada.

30. On February 13, 1991, Caesars Palace filed a joint complaint, with Caesars A.C., objecting to the dischargeability of its claims against the debtor. The debtor filed an answer to the complaint on March 7, 1991.

31. The casinos filed an amended complaint, with the leave of the court, on November 12, 1991. The debtor filed an answer to the amended complaint on November 19, 1991.

32. It is undisputed that on October 25 and 26, 1990, the debtor went to the Caesars Palace casino obtained $75,000 worth of gambling chips on credit. (*See* BRC's *Amended Complaint* and debtor's *Answer,* paragraphs 9–10.)

33. More particularly, on October 25, 1990, the debtor ascertained that he had a line of credit available at the casino.[7] The debtor then signed two counter checks payable to Caesars Palace, each in the amount of $20,000. In return, the debtor received $40,000 face amount of gaming chips for use in Caesars Palace casino. (*Id.* at paragraph 9.)

34. On October 26, 1990, the debtor executed two additional counter checks payable to Caesars Palace, in the amounts of $25,000 and $10,000, and received in exchange an additional $35,000 face amount of gaming chips for use in Caesars Palace casino. (*Id.* at paragraph 10.)

35. No portion of the $75,000 debt to Caesars Palace has been repaid to date—the chips were apparently lost by the debtor while engaged in gambling activities at the casino. (*Id.* at paragraph 11.)

36. The debtor stated on pages 90–91 of the Rule 2004 Examination he attempted to raise capital to pay back monies owed to the various casinos. (*See* debtor's *Supplemental Trial Brief,* p. 5.)

37. However, the court also notes the following exchange, which appears on page 52 of the 2004 Examination:

Q. [by Mr. Greiner] Between October 26 and November 7 did you take any steps to make deposits to either [M]idland Bank or the UJB account to cover the $75,000 that you owed to Caesars Palace under the markers that have been designated—

A. [by debtor] Yeah, I went down to Atlantic City and tried to win again.

Q. Was that your best available source of funds?

A. At the time I felt it was the only source of available funds I had.

(*See* BRC's *Designation of Defendant's Deposition to be Offered into Evidence as Admissions,* inclusive of p. 52, lines 4–14.)

38. Caesars Palace indicates on page 5 of its trial brief that it was unable to attempt to negotiate the counter checks by

---

7. This line of credit was based in part on the debtor's bank accounts which were on file with Caesars Palace: (1) United Jersey Bank, account number 226303209, and (2) Midland Bank, account number 10–102345–6. (*See* Trial Exhibits DP–3 and BRC–6, respectively.)

operation of the automatic stay, which became effective on November 7, 1990, and that the obligation remains due and owing.

39. Caesars Palace therefore seeks a determination that its $75,000 claim be nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (C), and (a)(6). Caesars Palace also seeks compensatory damages in the amount of $75,000, exemplary damages, interest, and the cost of the suit.

### CAESARS A.C.

40. Caesars A.C. is a hotel-casino establishment located in Atlantic City, New Jersey.

41. Caesars A.C. filed a joint complaint with Caesars Palace on February 13, 1991.[8] (*See* paragraphs 30–31, *supra.*)

42. On October 30, 1990, the debtor went to Caesars A.C. and obtained $400,000 worth of casino gambling chips on credit. (*See* BRC's *Amended Complaint* and debtor's *Answer*, paragraph 20.)

43. More particularly, the debtor executed ten separate counter checks in favor of Caesars A.C. in the amounts of $40,000 each. The counter checks were drawn upon Midland Bank, account number 10–102345–6. (*Id.* at paragraph 20.) These counter checks were admitted into evidence as Trial Exhibit BRC–5.

44. In exchange, the debtor was provided with a total of $400,000 in Caesars A.C. gaming chips. (*Id.*)

45. It is further stipulated that Caesars A.C. subsequently attempted to negotiate the counter checks, but that they were dishonored by the drawee bank because there were insufficient funds in the debtor's bank account. (*Id.* at paragraph 22.)

46. An abstract of the debtor's Midland Bank account, number 10–102345–6, submitted to the court at trial as exhibit BRC–6, indicates a balance of less than $20,000 at all times between 9/29/90 and 11/20/90.

47. The court notes that the debtor did not lose all of the Caesars A.C. chips—a fact evidenced by the debtor having turned over some $395,000 worth of the BRC chips to the trustee after filing for bankruptcy.

48. Caesars A.C. therefore seeks to have the $400,000 debt declared nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (C), and (a)(6). Caesars A.C. also seeks compensatory damages in the amount of $80,000 [9], plus interest and costs, and exemplary damages.

49. Therefore, between the dates of October 13, 1990 and October 30, 1990, within thirty days prior to the filing of the bankruptcy petition, the debtor received extensions of credit from numerous gambling casinos totaling $875,000.[10]

50. In the background of this conduct, the debtor admits to having consulted with attorneys regarding his filing for bankruptcy as early as fall of 1989. (*See* BRC's and Trump Castle's *Designation of Defendant's Deposition to be Offered into Evidence*, inclusive of pp. 25–26.) [11]

51. Further, the debtor admits to having solicited and obtained a bankruptcy petition form from an attorney a month or more before his filing date of November 7, 1990. (*Id.*, inclusive of pp. 26–27.)

### *BRC's Motion for Reconsideration of an Evidentiary Ruling*

52. On April 3, 1992, this court also heard BRC's motion for reconsideration of an evidentiary ruling which was made dur-

---

**8.** BRC further sought to compel the trustee to surrender to it some $395,000 worth of Caesars A.C. gaming chips, which were in possession of the bankruptcy estate. This count of the complaint was subsequently settled on the record before the court on January 7, 1991. Through this agreement, BRC agreed to pay the trustee $75,000 in exchange for the chips, but retained its claims against the debtor.

**9.** This sum is derived from the original $400,000 debt, less the $395,000 in gaming chips received from the trustee pursuant to settlement (cross

reference footnote 3, *supra*), plus the $75,000 paid to the trustee for the return of the chips.

**10.** This figure does not include the claim of MGM, which was settled prior to trial. (See footnote 2, *supra.*)

**11.** Additionally, the debtor admits to having considered filing a bankruptcy petition on a daily basis since fall of 1989. (See 2004 Examination, p. 111.)

ing the trial, at the conclusion of which the court reserved its decision.

53. Specifically, at trial the BRC plaintiffs had contended that the court should have drawn an adverse inference from the debtor's failure to appear to testify in his own defense. The court ruled that there was no obligation for the defendant to be present at trial and that no inference would be drawn.

54. During re-argument, BRC contended that because it established a *prima facie* case, and the debtor failed to testify in his defense, the court was *required* to draw a negative inference. (*See* BRC's *Memorandum of Law for Reconsideration of Evidentiary Ruling*, Preliminary Statement.)

## DISCUSSION

■ With respect to BRC's motion for reconsideration of the evidentiary ruling, the court finds no authority cited by BRC which requires this court to draw adverse inferences from the debtor's failure to testify at trial. BRC's memorandum of law cites a line of cases which "do not preclude the inference...." *E.g. Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976), (citations omitted). These opinions are illustrative of the authority of the court to make permissive findings in such circumstances.

■ The debtor, who was not subpoenaed to appear at trial, has been an active participant in these bankruptcy proceedings. His presence in the courtroom had been noted on a frequent basis in the weeks preceding the trial. Further, the parties have all had the opportunity to question the debtor in the 2004 Examination, and submit portions thereof at trial. BRC's motion for reconsideration of the evidentiary ruling is therefore denied.

With respect to the remaining issues, the court notes that traditionally, the public policy behind the discharge of debts in bankruptcy is to give the overburdened debtor a "fresh start." *In re Graham*, 111 B.R. 801 (Bkrtcy.E.D.Ark.1990). But this policy of a fresh start is not unrestricted:

[I]n the same breath that we have invoked this "fresh start" policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the "honest but unfortunate debtor."

*Grogan v. Garner*, —— U.S. ——, ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991), (*quoting Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). Consequently, pursuant to code section 524, the debtor is released from personal liability on discharged debts. *In re Lembke*, 93 B.R. 701 (Bkrtcy.D.N.D. 1988). However, in an effort "to discourage fraudulent conduct and to ensure that relief intended for honest debtors does not inure to the benefit of the dishonest ...," Congress adopted 11 U.S.C. 523. *In re Hunter*, 771 F.2d 1126, 1130 (8th Cir.1985), (*quoting In re Wilson*, 12 B.R. 363, 370 (Bkrtcy.M.D.Tenn.1981)).

The casino creditors have sought to have their claims determined to be non-dischargeable pursuant to various provisions of 11 U.S.C. §§ 523(a) *et seq.* Section 523 states in pertinent part that:

(a) a discharge under [11 U.S.C. §§ 727, 1141, 1228(a), 1228(b), or 1328(b)] does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $500 for luxury goods or services

incurred by an individual debtor on or within forty days before the order for relief under this title . . . are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor. . . .

11 U.S.C. §§ 523(a)(2)(A), (B), and (C). Section 523(a)(6) holds as nondischargeable those debts resulting from "willful and malicious injury by the debtor to another entity or to the property of another entity. . . ." 11 U.S.C. § 523(a)(6).

*A. Analysis under Section 523(a)(2)(A)*

■ In order to have a debt declared nondischargeable under § 523(a)(2)(A), a creditor must show:

(1) the debtor obtained money, property or services through a material misrepresentation;

(2) the debtor, at the time, knew the representation was false or made with gross recklessness as to its truth;

(3) the debtor intended to deceive the creditor;

(4) the creditor reasonably relied on the debtor's false representations; and

(5) the creditor sustained a loss and damages as a proximate result of the debtor's materially false representations.

*In re Ritzer*, 105 B.R. 424 (Bkrtcy.S.D.Ohio 1989), *(citing Coman v. Phillips*, 804 F.2d 930, 932 (6th Cir.1986). To meet this burden under § 523(a), creditors must prove their cases by a preponderance of the evidence standard. *See Grogan, supra.*

■ The casino creditors have individually substantiated their levels of proof by a preponderance of the evidence. To wit, it is undisputed that the debtor incurred significant casino debts on the eve of his bankruptcy, and without any clear knowledge as to how he would repay the debts. This is evidenced by the debtor's pattern in October, 1990, of personally traveling to casinos in Las Vegas, Nevada, and Atlantic City, New Jersey, and obtaining hundreds of thousands of dollars in credit based upon records which reflected a bank account which had insufficient funds to repay the obligations that were incurred.

To compound this material misrepresentation, the debtor admitted that he knew at the time he obtained credit from the casinos that the bank account had assets therein which were grossly inadequate to meet his newly incurred casino debts. Furthermore, this scienter was amplified on each subsequent occasion when the defendant provided the same credit information to obtain casino credit after having previously lost thousands of dollars on the same account. It is therefore noteworthy that "[d]ebtors in bankruptcy are presumed to intend the natural consequences of their acts. Thus, a debtor who makes a false representation is presumed to have intent to deceive." *In re D'Ettore*, 106 B.R. 715 (Bkrtcy.M.D.Fla.1989).

The debtor, who is an experienced businessman, engaged in this casino gambling spree without revealing his true financial status to any of his other casino creditors. They were notified only by filing of a chapter 7 petition. The record reflects that the debtor considered filing for bankruptcy more than one year prior his actual filing. Further, the debtor solicited a bankruptcy petition form approximately one month prior to his actual filing. Such conduct may only be construed as nondischargeable when viewed in the context of the debtor's financial condition. *See In re Lesher*, 80 B.R. 121 (Bkrtcy.E.D.Ark.1987); *In re Lacey*, 85 B.R. 908 (Bkrtcy.S.D.Fla.1988).

The creditors reasonably relied upon their established credit procedures in concluding that the debtor warranted an extension of credit. The casinos have produced evidence sufficient to prove to the court, by a preponderance of the evidence standard, that their acceptance of the debtor's new account information with its implied veracity, as well as the debtor's established history of satisfying his gambling debts, as well as other evidence and affidavits, was reasonably relied upon.

Finally, the casino creditors have sustained ascertainable monetary damages as a consequence of the debtor's actions.

## B. Analysis under Section 523(a)(2)(B)

█ Trump Castle alone has raised a challenge to the dischargeability of its claim under 11 U.S.C. § 523(a)(2)(B), *supra*, misrepresentations of a written nature. Based upon the stipulated facts, it is this court's conclusion that the Trump Castle claim is also nondischargeable pursuant this section. The Trump Castle credit markers were prepared at the debtor's instructions, using information provided by him. Although the markers bore language certifying the availability of collateral funds, the debtor signed these markers knowing that the account did not have enough money therein. The court notes that,

> the writing required by § 523(a)(2)(B) is sufficiently broad enough to include any statement made by the debtor, not just formal financial statements and documents in a bank or commercial setting.

*In re Howard*, 73 B.R. 694, 710 (Bkrtcy. N.D.Ind.1987). The totality of these express acts is indicative of the debtor's intent to deceive. *See Lesher* and *Lacey*, *supra*.

## C. Analysis under Section 523(a)(2)(C)

█ The casino creditors join in alternatively moving under 11 U.S.C. § 523(a)(2)(C) to have their claims deemed nondischargeable. It is undisputed that the acts complained of all occurred within forty days of the filing of the bankruptcy petition and involve amounts exceeding $500. Moreover, the debtor has argued neither that he utilized the casino chips for support and maintenance nor that the casino credit does not constitute a luxury good or service.

While definitive caselaw which classifies gambling as a "luxury good or service" is lacking, the court notes that the § 523(a)(2)(C) does not provide an exclusive definition other than to indicate that such goods or services are not those used for support or maintenance. Indeed, persuasive scholarly authority states that,

> [w]hile nothing in the Code, as amended, expressly prohibits discharging indebtedness incurred through speculation, the fact that the debtor incurred obligations with the intent to gain all of the upside if successful and none of the downside upon failure might be enough to convince a court of abuse. Thus while not enumerated in sections 523 or 727, gambling debt is of such a character that the debtor should continue to be obligated to repay that debt.

*See,* Karen Gross, *Preserving a Fresh Start for the Individual Debtor: the Case for Narrow Construction of the Consumer Credit Amendments.* 135 U.Pa.L.Rev. 59, 107 (1986), (citations omitted). This court is therefore satisfied that the casino creditors have alternatively proven their claims as nondischargeable pursuant to § 523(a)(2)(C) by a preponderance of the evidence.

## D. Analysis under Section 523(a)(6)

█ BRC has additionally sought a nondischargeable judgment for punitive damages. Sitting as a fundamental court of equity, this court concludes that the debtor's conduct failed to rise to the level of a "willful and malicious injury" which would warrant the award of punitive damages under 11 U.S.C. § 523(a)(6). BRC's claim for punitive damages is denied.

The claims of the casino creditors are therefore held to be nondischargeable under section 523. Judgment is entered in favor of the plaintiffs as follows: [12]

---

**12.** The court has rejected the arguments of Trump Castle and Caesars A.C. that the costs of their separate settlement agreements with the trustee should be included in the amount of the judgment entered against the debtor and declared as nondischargeable debts. In denying these costs, the court notes that the plaintiffs accepted settlement terms in lieu of prosecuting their complaints against the trustee to trial. These complaints were filed by Trump Castle and Caesars A.C. to recover gaming chips which were in the possession of the bankruptcy estate. (See footnotes 4, 5, 8 and 9, *supra*.)

The court further notes that the award to Trump Plaza does not reflect any adjustment which has been or may potentially be derived from the recovery of approximately $100,000 in Trump Plaza gaming chips alleged by the debtor to be in the possession of the trustee. (See paragraph 24, *supra*.) Any action to recover these chips shall be tied to the amount of this

TRUMP CASTLE          $190,000
TRUMP PLAZA           $200,000
CAESARS PALACE        $ 75,000
CAESARS A.C.          $  5,000

judgment such that the total award to Trump Plaza will not exceed the original $200,000 debt.