**In re Stanley H. HALL, Debtor.**

**Boyd Gaming Corporation d/b/a Sam's Town Hotel & Gambling Hall, Plaintiff,**

v.

**Stanley H. Hall, Defendant.**

**Bankruptcy No. 97–52810–JDW.**
**Adversary No. 97–5119–JDW.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

Sept. 17, 1998.

Wesley J. Boyer, Katz, Flatau, Popson, & Rover, Macon, GA, for debtor.

John A. Thomson, Jr., Womble Carlyle Sandridge & Rice, PLLC, Atlanta, GA, for Boyd Gaming Corp.

## MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Complaint filed by Boyd Gaming Corporation ("Boyd Gaming") Objecting to the Discharge of Certain Debts. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(J). After considering the pleadings, evidence and applicable authorities, the Court enters the following findings of fact and conclusions of law in compliance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Boyd Gaming owns and operates Sam's Town Hotel & Gambling Hall ("Sam's Town") in Robinsville, Mississippi. In the ordinary course of its business, Boyd Gaming extends credit to potential gamblers to finance their gambling activities. To receive credit, the potential gambler fills out a credit application, providing information about current bank accounts. Boyd Gaming then determines the applicant's credit worthiness. The determination is made from information gathered from four potential sources. However, Boyd Gaming will often not utilize all four sources for every customer. The first source is the credit application completed by the applicant. Second, Boyd Gaming verifies

the information with the applicant's bank by asking the bank to provide a six-month average balance on the account, as well as the opening date of the account. Third, Boyd Gaming may check a central computer database that links gaming facilities located worldwide. This database provides information such as previous bank history reported by the applicant, the amount of credit extended to the applicant before at other gaming facilities, and any outstanding debts the applicant owes at these facilities. Finally, Boyd Gaming may get a formal credit bureau report.

Once Boyd Gaming determines the applicant's credit worthiness it sets a credit limit. The applicant can then borrow up to that limit to finance gaming activities. The amount the gambler chooses to borrow is evidenced by a "marker." A marker is a negotiable instrument that evidences an interest free, thirty-day loan. The debtor represents that enough money is on deposit in the debtor's bank to cover the amount of each marker.[1] If the debtor fails to liquidate the marker within thirty days, Boyd Gaming negotiates the marker by depositing it for collection from the debtor's bank.

Stanley H. Hall ("Debtor") has been a casino gambler for fifteen years. In those years he has lost hundreds of thousands of dollars. In addition to gambling, Debtor has been in the automobile business for approximately twenty-five years. He owns Stan Hall Motors, Inc., a used car dealership. During the last two years, Debtor earned approximately $6,800.00 per month from his automobile business. However, the business, as described by Debtor himself, was a "sinking ship." Debtor was behind on redemption payment deadlines imposed by two commercial floor plan creditors, West Central Georgia Bank and Atlanta Auto Auction ("Atlanta Auto"). Debtor owed Bank approximately $25,000.00 and Atlanta Auto approximately $350,000.00. Atlanta Auto had begun conducting biweekly audits of the inventory of cars on Debtor's car lot.

Because of the distressed state of his business, Debtor was unable to pay the amount owed to liquidate markers evidencing his debt to casinos. Instead, Debtor would "roll" his markers by borrowing money—executing markers—from one gambling facility and using that borrowed money to pay off existing markers at other facilities. The casinos appear to be willing to honor chips from certain other casinos as cash. In this way, Debtor tried to keep one step ahead of the casinos and prevent them from negotiating the markers against his bank deposits.

Debtor first visited Sam's Town on February 22, 1997. During that visit, Debtor submitted a credit application to Boyd Gaming to borrow funds to finance his gambling activities for that weekend. Boyd Gaming contacted Debtor's bank, West Central Georgia Bank ("Bank"), and learned that Debtor's personal account was opened in June of 1974 and that he had a six-month average balance in his personal account of a "low three." A low three indicates that the depositor maintains an account that averages between $100.00 to $300.00. In addition, Bank volunteered that Debtor's business accounts had a six-month average of a "low to moderate five"—an average between $10,000.00 to $50,000.00. Next, Boyd Gaming checked the central credit computer database and learned that while Debtor had been quite active in playing at other casinos, he owed no outstanding debt obligations to those casinos. Boyd Gaming did not obtain a formal credit bureau report. Thereafter, Boyd Gaming approved a $25,000.00 credit limit for Debtor. During the first trip, Debtor executed several markers evidencing $6,000.00 of debt. Debtor liquidated these markers according to their terms during this same trip.

Debtor next visited Sam's Town on April 19, 1997. During this trip he executed markers evidencing $14,000.00 of debt. Debtor liquidated these markers in three installments occurring on April 21, May 18, and June 3. Debtor visited Sam's Town a third time in May of 1997. This time Debtor

---

**1.** Each marker contains the following pre-printed statement: "I represent that the above amount is on deposit in said financial institution in my name, free from prior claims, and I guarantee payment. I agree to pay costs of collection including attorney's fees in the event of dishonor."

executed markers evidencing $23,000.00 of debt.

Debtor's final visits to Sam's Town occurred on June 14 and 15 of 1997. Debtor had not yet liquidated the markers evidencing the $23,000.00 debt incurred on his previous visit. In addition, Debtor had more than $50,000.00 in outstanding thirty-day markers from various other casinos. During his visit, Debtor paid the $23,000.00 owed to Boyd Gaming with cash and chips. However, Debtor executed six more markers evidencing $14,000.00 of debt which he used for gambling purposes during this trip.

Whether Debtor had enough unencumbered funds in his bank account to cover the amounts evidenced by these markers is the subject of some dispute. Debtor's bank records indicate that on June 13, 1997, the Friday before his visit to Sam's Town, he had a balance of $80,138.86. However, on the Monday following his visit, Debtor's account had a negative balance of $76,036.79. At trial, Debtor asserted that he believed he had a positive balance of approximately $165,000.00 at the time he executed the markers. However, neither party presented any evidence of outstanding checks and other claims against those deposits, so the Court can make no finding regarding whether Debtor had sufficient deposits to cover the markers at the time they were executed. What is clear, however, is that Debtor recognized he would not be able to pay off the markers from assets outside of his gambling activities. Rather Debtor based his ability to pay the markers purely on the "hope of winning." Unfortunately, Debtor suffered a gambling loss of approximately $5,200.00 during the June 14–15 weekend. As a result, he returned to Georgia without liquidating the $14,000.00 markers.

As a result of continued financing problems, Atlanta Auction seized the inventory on Debtor's car lot on or around June 17, 1997. In addition, Bank froze Debtor's bank account. By this time, Debtor had accumulated gambling debts in the amount of approximately $97,000.00 at various gambling facilities, including Sam's Town. As a result, Debtor sought counsel from a bankruptcy attorney and ultimately filed a Bankruptcy petition under Chapter 7 of the Bankruptcy Code on June 25, 1997.

On July 17, 1997, the thirty-day period on Debtor's markers expired without being liquidated. Boyd Gaming negotiated the markers seeking to collect from Bank. However, Bank returned the markers stamped "insufficient funds, refer to maker." Debtor now seeks to discharge the $14,000.00 debt owed to Boyd Gaming pursuant to section 727 of the Bankruptcy Code. Boyd Gaming objects to this discharge claiming that Debtor obtained the $14,000.00 in markers fraudulently. Boyd Gaming has asked the Court to exempt this debt from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (C) (1988).

*Conclusions of Law*

The purpose of the Code's discharge provisions is to allow insolvent debtors a chance to "make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Chase Manhattan Bank v. Ford (In re Ford)*, 186 B.R. 312, 316 (Bankr.N.D.Ga. 1995) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). However, this opportunity is only afforded to the honest, yet unfortunate, debtor. *Id.* In order to ensure that only honest debtors get the benefit of this fresh start, the Code provides exceptions to its discharge provisions. These exceptions are contained in 11 U.S.C. § 523.

The exception relevant to this case is contained in section 523(a)(2)(A), which provides in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—(2) for ... an extension ... of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition[.]

11 U.S.C. § 523(a)(2)(A). Because the fresh start is one of the Code's most important objectives, exceptions to discharge are to be narrowly construed in favor of the debtor. *See Ford*, 186 B.R. at 316 (citing *Schweig v.*

*Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986)), *abrogated by, Grogan,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (establishing the standard of proof as preponderance rather than clear and convincing); *Chevy Chase Bank v. Briese (In re Briese),* 196 B.R. 440 (Bankr.W.D.Wis.1996). To deny debtor a discharge under section 523(a)(2)(A) the following elements must be satisfied:

> (1) the debtor must have made a false representation with the purpose and intention of deceiving the creditor;
>
> (2) the creditor must have justifiably relied upon the debtor's representation; and
>
> (3) the creditor must have suffered a loss as a result of that reliance.

*See Ford,* 186 B.R. at 316 (citing *Hunter,* 780 F.2d at 1579). Normally, the burden is on the creditor to prove each of these elements by a preponderance of the evidence. *Id.* However, the creditor can gain the benefit of a rebuttable presumption and shift the burden to the debtor to prove these elements have not been satisfied if it can satisfy the provisions of 11 U.S.C. § 523(a)(2)(C).

Because it is necessary to determine which party bears the burden when analyzing section 523(a)(2)(A), the Court will first address Boyd Gaming's section 523(a)(2)(C) argument. Section 523(a)(2)(C) provides as follows:

> [F]or purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, ... are presumed to be nondischargeable[.]

11 U.S.C. § 523(a)(2)(C). Boyd Gaming claims that gambling is a "luxury service" and that, therefore, Debtor's $14,000.00 debt incurred for the purposes of gambling within ten days of filing his bankruptcy petition satisfies this presumption so that the burden is on Debtor to prove that the provisions of section 523(a)(2)(A) have not been satisfied. This court disagrees.

Section 523(a)(2)(C) does not define "luxury goods and services" other than to provide that they do not include goods or services used for the maintenance or support of debtor or debtor's dependents. 11 U.S.C. § 523(a)(2)(C). In addition, there is little case law that considers whether gambling qualifies as such. Cases cited by Boyd Gaming in support of its argument shed little light on this issue. The first case cited, *Trump Castle Assocs. v. Poskanzer (In re Poskanzer),* 143 B.R. 991, 1000 (Bankr.D.N.J. 1992), contains a finding that gambling is a luxury good or service. However, the court had already found that the creditors had satisfied their burden under section 523(a)(2)(A) and the debtor did not argue against a finding that gambling is a luxury good or service. *Id.* Therefore, the court simply noted that section 523(a)(2)(C) does not provide an exclusive definition of "luxury goods or services," opined that gambling debts are debts that should not be subject to discharge in bankruptcy, and thus concluded that they fall within the definition. *Id.* The Court finds this cursory examination of the issue by the court in *Poskanzer* of little help.

The second case cited by Boyd Gaming in support of their argument is *AT & T v. Herrig (In re Herrig),* 217 B.R. 891 (Bankr. N.D.Okla.1998). In *Herrig* the court declared gambling a luxury, rather than a necessity, in its analysis of the creditor's section 523(a)(2)(A) claim. *Id.* at 897. The court provided no explanation for this determination. As a result, this case is not helpful in deciding whether gambling is a luxury good or service under section 523(a)(2)(C). Finally, Boyd Gaming cites a footnote in *Boatmen's Bank of Tennessee v. Embry (In re Embry),* 10 F.3d 401, 402 n. 1 (6th Cir. 1993), in which the court simply makes reference to the fact that the lower courts had found gambling to be a consumer debt for luxury goods or services, but that the issue was not appealed. With no further analysis provided, this case provides little help as well. The Court, therefore is left to resolve this issue without the benefit of any reasoning from another court.

In the absence of any statutory definition, the notion of "luxury" must be regarded as a subjective concept. There are those who glory in the simple pleasures of life and

relish with great anticipation such "luxuries" as a morning bath, a quick breakfast, and a commute to work. Others regard the same daily activities as boring and oppressive "necessities." The quest for a linguistic definition, or even connotation, of an elusive concept such as gambling, cannot be made apart from the individual whose motivation and life circumstances may lead to the activity via one of many paths.

"Luxury" is defined as "something adding to pleasure or comfort but not absolutely necessary.... [A]n indulgence in something that provides pleasure, satisfaction, or ease." WEBSTER'S COLLEGIATE DICTIONARY 695 (10th ed.1994). While this Court certainly does not find that gambling is ever a necessity, neither does it find that it is always a luxury either. There is a difference between the type of gambling at issue in this case and the type of recreational gambling that is for many people a form of pleasurable entertainment. In the latter case, it seems obvious that such an individual is paying for a luxury service. Were that individual to incur a debt in the pursuit of gambling as entertainment, and assuming all of the other elements of section 523(a)(2)(C) were met, it is likely that the presumption of nondischargeability would apply. But this case is different in many respects.

▪ Debtor has gambled for over fifteen years losing hundreds of thousands of dollars. Because his automobile sales business had fallen on hard times, he came to believe that the only way to meet his ever-increasing financial obligations is the hope for that big score—the jackpot that will finally save him from financial ruin. This Debtor's recent gambling activities reflect a spirit of desperation, not pleasure. He had come to know gambling as a necessity, as much to satisfy the holders of his markers with his continuing wagering as to make the big score. As such, this Court does not find that his gambling activity meets the definition of a luxury. Therefore, the provisions of section 523(a)(2)(C) have not been satisfied, and there is no presumption in this case that the $14,000.00 debt is nondischargeable.

As a result of the above analysis, Boyd Gaming bears the burden of proving this debt is exempt from discharge under section 523(a)(2)(A). It is the judgment of this Court that Boyd Gaming has not carried its burden.

▪ Section 523(a)(2)(A) prevents the discharge of a debt incurred by a debtor by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). The focus here is on whether Debtor committed "actual fraud" when he incurred the $14,000.00 debt. "Actual fraud" is not specifically defined in section 523, however, the United States Supreme Court has resolved this dilemma by concluding that we are required to use the common-law understanding of this term. *See Field v. Mans*, 516 U.S. 59, 69–70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *see also AT & T Universal Card Servs. v. Scocozzo (In re Scocozzo)*, 220 B.R. 850, 852 (Bankr.M.D.Pa.1998); *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 333 (Bankr.N.D.Ill.1995). "At common law, a promise of future performance or intention is actionable as fraud if at the time the statement was made, the debtor never actually intended to honor the statement." *Briese*, 196 B.R. at 449 (citing *Murphy*, 190 B.R. at 332). The subjective test of intent to defraud is used which is found by a consideration of all the circumstances of the case at hand. *Murphy*, 190 B.R. at 333.

Boyd Gaming claims that Debtor had the requisite intent not to repay his debt when he executed the $14,000.00 in markers. In support of this argument, Boyd Gaming points to the fact that Debtor incurred this debt only ten days prior to filing his bankruptcy petition at a time when he knew that his business—his sole source of income—was a "sinking ship." Boyd Gaming claims that this demonstrates Debtor's inability to repay the debt from which a lack of intent to repay can be inferred.

▪ This Court recognizes those cases that stand for the proposition that a mere inability to repay a debt when incurred infers fraudulent intent.[2] But mere inability to repay is not enough. While it may constitute

2. *See Eashai v. Citibank (In re Eashai)*, 167 B.R. 181, 185 (9th Cir. BAP 1994), *aff'd*, 87 F.3d 1082

indicia of an intent to defraud, *Ford,* 186 B.R. at 320, further inquiry is required. Specifically, this Court must find that at the time Debtor executed the markers, he was guilty of "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." *Hunter,* 780 F.2d at 1579; *accord Ford,* 186 B.R. at 317 n. 7 ("Without proof of . . . malevolent intent, one has not established actual fraud, but instead merely 'fraud implied by law' or 'constructive fraud.' ").

The evidence in this case does not point to the conclusion that Debtor acted with the malevolent intent necessary to constitute actual fraud. At the time he executed these markers his business was still operating, and it was not until after his inventory was seized and his bank accounts frozen that he sought legal advice which resulted in the filing of this bankruptcy case. Certainly Debtor acted irresponsibly by ignoring his actual financial situation, but it is just that type of financial irresponsibility that the bankruptcy courts deal with every day. *See Scocozzo,* 220 B.R. at 852 ("[B]ankruptcies proliferate because of the unreasonableness of the debtor's financial decisions.").

Boyd Gaming further asserts that Debtor's intent to repay his debt solely from the "hope of winning" is insufficient to establish the requisite intent to defeat a claim of fraud. This Court recognizes that the courts have differed on the issue of whether hoped for gambling winnings constitute a sufficient source of repayment to rebut a claim of fraudulent intent.[3]

■ Those courts that find that hope to repay from gambling winnings does not evidence an intent to repay do so believing that "[m]ere hope, or unrealistic or speculative sources of income, are insufficient" to establish this intent. *Clagg,* 150 B.R. at 698. However, this Court notes that an expression of intent to repay a debt is an expression of future intent. Without knowing the future, every borrower is merely speculating as to their ability to repay at a future date. Any number of contingencies could occur that would render the borrower incapable of repaying their debt. That does not render their intent to repay at the time the debt was incurred as fraudulent.

"Care must be taken to stop short of a rule that would make every desperate, financially strapped debtor a guarantor of his ability to repay, on pain of dischargeability. Such a rule would unduly expand the 'actual fraud' discharge exception by attenuating the intent requirement. A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting nondischarge."

*Alvi,* 191 B.R. at 733 (quoting *Karelin v. Bank of Am. Nat'l Trust & Sav. Ass'n (In re Karelin),* 109 B.R. 943, 948 (9th Cir. BAP 1990)). So long as the debtor has an honest, even if unreasonable, belief that he will get lucky at gambling and pay off his debts then this Court is satisfied that the debtor has the requisite intent to repay. *See id.* at 734 n. 19 (citing *Landen,* 95 B.R. at 829). Though Debtor had been losing at gambling for over fifteen years, the Court finds, that he honestly, though unreasonably, believed that he would one day get lucky and be able to satisfy his debts. The circumstances of this case simply do not allow a finding by this Court that Debtor acted with such malevolent intent to defraud Boyd Gaming as to

(1996) ("Use of credit card without a reasonable prospect of ability to repay or to meet its contract terms is circumstantial evidence from which a court may infer a fraudulent intent."); *Chemical Bank v. Clagg (In re Clagg),* 150 B.R. 697, 698 (Bankr.C.D.Ill.1993) ("Intent to repay requires some factual underpinnings which lead a person to a degree of certainty that he or she would have the ability to repay.").

3. Cases that find that a debtor's hope to repay debts from gambling winnings demonstrates intent to repay include *Scocozzo,* 220 B.R. at 853,

*AT & T Universal Card Servs. v. Alvi (In re Alvi),* 191 B.R. 724, 734 (Bankr.N.D.Ill.1996), *Murphy,* 190 B.R. at 334, and *First Federal v. Landen (In re Landen),* 95 B.R. 826, 829 (Bankr.M.D.Fla. 1989). Cases that find hope to repay from gambling winnings too speculative and unreasonable to constitute intent to repay include *American Express Travel Related Servs. Co. v. Nahas (In re Nahas),* 181 B.R. 930, 934 (Bankr.S.D.Ind.1994), *Clagg,* 150 B.R. at 698, *Poskanzer,* 143 B.R. at 999, and *Citibank v. Hansbury (In re Hansbury),* 128 B.R. 320 (Bankr.D.Mass.1991).

satisfy the intent element of section 523(a)(2)(A).

Even if Boyd Gaming had proven that Debtor's intent to repay was fraudulent, this Court finds that Boyd Gaming did not satisfy its burden in establishing reliance. The standard of reliance used in section 523(a)(2)(A), as it was understood at common law, is justifiable, rather than reasonable, reliance. *Field,* 516 U.S. at 74, 116 S.Ct. 437. Whether a creditor justifiably relied on representations made by the debtor is to be determined on a case-by-case basis. *Id.* at 71, 116 S.Ct. 437. The court is to look at the characteristics of each particular creditor and the circumstances of each particular case, rather than applying a community standard of conduct to all cases. *Id.* Specifically, this Court must find that the steps taken by Boyd Gaming in determining Debtor's credit worthiness were sufficient for them to be justified in believing they were not being deceived. *See id.* ("[A] person is required to use his sense and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.").

Considering the circumstances in this case, there is no evidence of justifiable reliance. The Court finds Boyd Gaming's credit examination procedures insufficient to constitute reliance on Debtor's credit worthiness. A six-month average balance alone, without any further inquiry into the borrower's assets and liabilities, says very little about a borrower's present ability to pay a debt at some point in the future. Further, each extension of credit to Debtor on each separate visit constituted a new, separate transaction. Yet Boyd Gaming only bothered to check Debtor's credit worthiness one time, four months before extending the $14,000.00 of credit considered in this case. During that four month period, Debtor was late in liquidating markers executed from a previous visit,[4] and when Debtor executed the June 14th and 15th markers, he still owed on markers executed from his visit in May. Yet, despite these negative indications, Boyd Gaming extended credit to Debtor without conducting any further investigation. Had they done so, they would have learned that Debtor had accumulated approximately $50,000.00 in debt at other area casinos. Such minimal and half-hearted inquiry hardly constitutes reliance, much less justifiable reliance.

In conclusion, Boyd Gaming failed to satisfy their burden in proving by a preponderance of the evidence 1) that Debtor's intent to repay the $14,000.00 debt was fraudulent, and 2) that they extended such credit in justifiable reliance on any representations made by Debtor. Therefore, this Court will deny Boyd Gaming's objection to discharge of this $14,000.00 debt and order all debts discharged pursuant to the provisions of 11 U.S.C. § 727.

An order in accordance with this opinion will be entered on this date.

### ORDER

In accordance with the memorandum opinion entered on this date, it is hereby

ORDERED that Boyd Gaming's Objection to the Discharge of Stanley H. Hall's debt is DENIED

---

4. Debtor executed markers totaling $14,000.00 during his visit to Sam's Town on April 19, 1997. However, these markers were not fully liquidated until June 3, 1997, forty-five days after originally executed.